[No. F009507. Fifth Dist. Jan. 20, 1989.]

TINA M. HURLBUT et al., Plaintiffs and Appellants, v.
SONORA COMMUNITY HOSPITAL, Defendant and Appellant.

**COUNSEL**

Bruce Albion Bailey for Plaintiffs and Appellants.

Ian Herzog, Evan Marshall, Leonard Sacks, Robert Steinberg, Robert E. Cartwright, Richard D. Aldrich, Harvey R. Levine, Douglas De Vries, Bruce Broillett, Guy Saperstein, Gary Gwilliam, Sanford Gage and Robert Wrinkle as Amici Curiae on behalf of Plaintiffs and Appellants.

Donahue & Callaham, James E. Donahue, Gregory P. Matzen and Stephen J. Mackey for Defendant and Appellant.

Hassard, Bonnington, Rogers & Huber, David E. Willett, Musick, Peeler & Garrett, James E. Ludlam, Charles F. Forbes, Horvitz, Levy & Amerian, Ellis J. Horvitz, David S. Ettinger and S. Thomas Todd as Amici Curiae on behalf of Defendant and Appellant.

OPINION

BEST, J.—

### STATEMENT OF THE CASE

Plaintiffs Rose Marie Hurlbut and her mother and father, Tina and Louis Hurlbut, sued defendant Sonora Community Hospital (Hospital) for medical malpractice in failing to perform a timely caesarean section procedure resulting in Rose Marie being born with severe brain damage. The complaint set forth separate causes of action on behalf of each plaintiff; the first for Rose Marie Hurlbut by Louis Hurlbut as her father and guardian ad litem; the second by Tina Hurlbut; and the third by Louis Hurlbut on his own behalf.

Obstetrician Donovan Teel, M.D., was also named as a defendant, but settled with plaintiffs prior to trial.

Following a lengthy trial, the jury rendered a verdict in favor of each of the plaintiffs. In special findings, the jury concluded that Hospital was 100 percent responsible for damages occasioned by the failure to perform a caesarean section in a timely manner.

The judgment entered August 13, 1987, provides in pertinent part:

1. Defendant shall pay plaintiff Rose Marie Hurlbut the sum of $11,500 per month for medical expenses.

2. Defendant's obligation for monthly payments will cease upon the death of Rose Marie Hurlbut.

3. Defendant shall pay to plaintiff Tina Hurlbut the amount of $250,000 for noneconomic damages.

4. Defendant shall pay to plaintiff Louis Hurlbut the amount of $250,000 for noneconomic damages.

5. Defendant shall pay to plaintiff Rose Marie Hurlbut the amount of $250,000 for noneconomic damages.

6. Defendant shall pay the sum of $350,000 for damages caused by the loss of earning capacity of Rose Marie Hurlbut.

7. Defendant shall pay the amount of $14,603 for compensation for monetary payments made for the care of Rose Marie Hurlbut.

8. Judgment will not enter in respect to the jury's award of $20,000 for economic loss caused by negligent infliction of emotional distress because of

the court's determination that "there is inadequate appellate authority for rendition of Judgment as to this element of damages."

Hospital filed a motion for judgment notwithstanding the verdict and a motion for new trial, or in the alternative, a motion to vacate judgment and enter another and different judgment. The motion for judgment notwithstanding the verdict was denied in its entirety while the motion for new trial was conditionally granted as to one issue only; if plaintiffs agreed to a reduction in noneconomic damages from $750,000 to $250,000, in the court's opinion the maximum recovery authorized under Civil Code section 3333.2, the new trial motion would be denied.

The Hurlbuts filed a cost bill and motion to allow costs to recover expert witness fees. Hospital challenged the motion on the grounds that plaintiffs' Code of Civil Procedure section 998 demand was void *ab initio*. The trial court initially denied the request for expert witness fees, but upon reconsideration granted the motion.

Hospital filed an appeal from the order denying judgment notwithstanding the verdict and conditionally granting new trial and the underlying judgment. The Hurlbuts filed a cross-appeal. Amicus curiae briefs were filed on behalf of all parties.

## STATEMENT OF FACTS

Tina Hurlbut and her husband arrived at Sonora Community Hospital on the evening of October 29, 1985. Tina was examined around midnight by obstetrician Donovan Teel. An internal fetal monitor was placed by Dr. Teel at approximately 2:30 a.m. on October 30, 1985. Louis Hurlbut had never seen a fetal monitor before, but Dr. Teel explained how it worked before he left the hospital shortly thereafter. Mr. Hurlbut understood that the monitor tape reflected the baby's heartbeat and the mother's contractions. It was stipulated by counsel that Louis Hurlbut "doesn't know what it means, he can't interpret it." Hurlbut nevertheless testified that he became "worried" around 3 a.m. because "I seen there was a difference in that reading than there was earlier. I don't know fetal monitoring, I know that's what I seen."

Numerous experts interpreted the fetal monitor tape as demonstrating an umbilical cord compression pattern. However, there were significant differences in opinion regarding these interpretations from experts on both sides. There was expert testimony that interpretation of the monitor strip was subjective and difficult in this case. Plaintiffs' expert testified that a normal, intact brain "makes the heartbeat look erratic; makes it jump around," creating a "wiggly" monitor line. Decelerations in heartbeat are attributable to a number of normal factors including contractions, medica-

tion, vaginal examinations, and grunting and movement of the fetus. Only a reading of the tape as a whole provides a clear picture of distress from cord compression.

Mr. Hurlbut remained with his wife during most of her labor. Shortly after a nurse secured Louis Hurlbut's consent to surgery at 5:45 a.m., Dr. Teel arrived at the hospital and told Mr. Hurlbut he would prepare the necessary paperwork for a caesarean section. Dr. Teel was not in any apparent hurry to commence the surgery at that time. Mr. Hurlbut left his wife's room to speak with his mother-in-law in the hallway. Approximately 10 minutes later, he saw Dr. Teel and a nurse rush into Tina Hurlbut's room and remove her by gurney to the surgical room. Things were knocked over in the process of moving Mrs. Hurlbut. Louis was not present in the surgery during the emergency caesarean section procedure which culminated with the child's delivery at 6:26 a.m. There was expert testimony that a fetal heart deceleration which occurred at 6 a.m. resulted in severe brain damage to the infant, though it was disputed whether a single incident was the sole cause of injury as plaintiffs contended.

Dr. Teel, the treating obstetrician, was not criticized by any expert for providing treatment beneath the standard of care. He testified that the attending nurse should have called him earlier to report an unsatisfactory monitor reading, which would have allowed for the surgical procedure prior to the severe deceleration of the heartbeat which occurred around 6 a.m.

It was undisputed that the late arrival of anesthetist Hay delayed the surgery, though no expert testified that Dr. Hay's conduct was beneath the standard of care. It was argued by plaintiffs' counsel that the absence of a contractual provision requiring Drs. Hay and Teel to be available for surgeries within 30 minutes of notice constituted negligence on the part of Hospital, even though hospital guidelines so provided.

Rose Marie Hurlbut suffered severe neurological damage from asphyxia and will require lifetime care. Jurors determined her life expectancy to be 27½ years.

## DISCUSSION

### APPEAL

### I

*Whether There Was Substantial Evidence to Support the Jury's Award of Noneconomic Damages to Louis and Tina Hurlbut for Negligent Infliction of Emotional Distress*

■ Where the evidence is in dispute, the appellate court will not disturb the verdict of the jury or the findings of the court. "The presumption being

in favor of the judgment, the court must consider the evidence in the light *most favorable to the prevailing party,* giving him the benefit of *every reasonable inference,* and *resolving conflicts* in support of the judgment." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289.)

■ To preclude a reviewing court from disturbing a verdict, the supporting evidence must be more than a "mere scintilla"; it must be such as will convince a reasonable man that the evidence establishes the plaintiff's case. (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].)

"[I]f the word 'substantial' means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (112 Cal.App.3d at p. 644.)

■ In *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], the California Supreme Court held that a parent who witnesses the negligent infliction of death or injury on her child may recover for the resulting emotional distress and physical injury. *Dillon* provided guidelines for determining whether a cause of action was stated in a particular case: (1) whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it; (2) whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident as contrasted with learning of the accident from others after its occurrence; (3) whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. *Dillon* makes clear that these guidelines should be applied to determine the extent of liability in future cases but emphasizes that definitions for recovery cannot be fixed and adjudication must be on a case-by-case basis. (*Id.* at pp. 739-741.)

Mr. and Mrs. Hurlbut base their emotional distress claims solely on the "bystander" theory expressed in *Dillon.* They did not contend at trial they were "direct" victims of the allegedly negligent acts, a theory factually dissimilar to the "bystander scenario." (See *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 923 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518].)

■ In the circumstances of this case, analysis of the second *Dillon* guideline is dispositive. The absence of any substantial evidence to support a finding by the jury of the existence of the second *Dillon* factor—that the shock to Mr. and Mrs. Hurlbut resulted from a direct emotional impact to either of them from the sensory and contemporaneous observance of the

injury to Rose Marie—requires reversal of the judgment awarding to each of them damages for negligent infliction of emotional distress.

There is an element of "certainty of injurious impact" necessary to establish the requisite sensory perception of the injury-producing event. (*Scherr v. Hilton Hotels Corp.* (1985) 168 Cal.App.3d 908, 911 [214 Cal.Rptr. 393].) ■ "Put simply, it is the contemporaneous perception of the *infliction* of *injury* on a closely related person that causes actionable emotional shock to a third party bystander. [Citation.] Perception of endangerment, while potentially stressful, is insufficient to cause legally cognizable harm, for the stress has not yet ripened into disabling shock. [Citation.]" (*Ibid.*)

■ Plaintiffs concede that Louis Hurlbut was not present and Tina Hurlbut was unconscious during the caesarean delivery.

Tina Hurlbut contends that the following general facts are sufficient to support her claim of emotional distress: She asked for a caesarean section at 4 a.m.; the doctor tried to push the fetus back up through the pelvis at one point; she was hurriedly transported to surgery; she may have had some sensation of the initial incision; she was administered oxygen "for the baby"; she observed the administration of oxygen to her baby after regaining consciousness.

Mr. and Mrs. Hurlbut cite to the following trial testimony in support of their emotional distress claims: Louis Hurlbut testified that his wife brought up the subject of a caesarean section at 4 a.m. when she was in a lot of pain and asked if the baby could be delivered surgically.

Tina Hurlbut testified concerning the course of her labor: "Q. [Plaintiffs' counsel]: Directing your attention to the condition of the baby, what was your state of mind toward the end of the labor?

"A. Well, the—I really didn't know Rose was in trouble. I guess I was just so busy with these contractions, and in the very end I remember being on my hands and knees and I believe they were trying to push her back up inside of me. All I remember was a lot of pain, a lot of pain.

"And they put an oxygen mask on my face. I was having a hard time putting up with the contractions, let alone something on my face and I was trying to pull it off until somebody, and I don't know who, screamed it's for the baby, and then, that's all I remember, and I just stuck it to my face, and then from then on that's all I was concerned about, was the baby, because I had no idea she was in trouble to that point.

"Q. Okay. How did you feel at that point?

"A. I felt really scared.

"Q. Do you remember being in the operating room?

"A. Just barely. I remember shortly after the hands and knees deal, I remember being wheeled out to the operating room very quickly, so quickly that I had to bring my fingers in from the gurney so that they wouldn't get hit up against the wall and I was real scared.

"The gurney might have even been on a tilt, I remember I felt like I was going to fall. And then in the operating room all the lights and everything, I could hear voices and I kept asking them, put me out, put me out, because I knew what was to come. And I could feel a shot and then I could feel Dr. Teal [sic] started to cut and then I really couldn't handle that at all. After all I'd been through, and I kept asking him please, please, just put me out, put me out. The last thing I remember was a mask on my face and a 'shut up, Tina.' "

After recovering from the anaesthesia, Tina Hurlbut observed her child under the care of hospital personnel: "And I started to come to, and I could hear bagging, the—(noise made by witness)—after bagging, and I looked over, and I could see a baby. I didn't know for sure if that was Rose. And someone was bagging her with a bag, and a lot of people were huddled over her. And I kept trying to ask where was my baby, what was going on, and they couldn't understand me because I wasn't speaking very well, I was still quite out of it.

"And then, finally, someone came over and told me that that was Rose. And then as I started to come to I could see my husband and my mom peeking through the recovery door windows."

In support of his claim for emotional distress, Louis Hurlbut contends that he remained with his wife during most of her labor, watched the fetal monitor and became worried when the tracings changed, saw personnel rush into his wife's delivery room and transport her by gurney to surgery (knocking things over in the process), and observed his new daughter being given oxygen after her birth. Mr. Hurlbut cites the following specific trial testimony: Louis was "concerned" about changes observed in the fetal monitor about 3 a.m. He asked the attendant nurse about the changes and was reassured that they had something to do with position changes.

A physician expert testified, in describing a section of monitor tracing showing decelerations beginning at 5:40 a.m., "This looks frightening in, you know, to the patient, to the husband, to anybody that's around, because the thing is all over the place. And what's so remarkable having seen that, then you come right back with a normal tracing."

The attending nurse confirmed that Mr. Hurlbut "expressed concern [about the fetal monitor] and I was telling him, explaining to him their fetal monitor strip and showing him the response to changes and things like that."

Plaintiffs concede that Louis Hurlbut is not an expert in interpreting the monitor and was not qualified to determine when the monitor reflected a condition calling for medical intervention.

Mr. Hurlbut claims to have suffered emotional distress when a second nurse entered his wife's hospital room and immediately began preparing her for a caesarean section. At that time Louis was asked to sign a consent form for the surgery and was advised that Dr. Teel would agree to the procedure.

Although it is contended that Mr. Hurlbut was beside his wife at the "time of the disastrous deceleration at 6:00 a.m.," the record suggests otherwise. As noted earlier, Louis Hurlbut signed the consent form at 5:45 a.m. and left his wife five minutes later to join his mother-in-law in the hallway. It was from that vantage point that he observed the rush to remove Mrs. Hurlbut to the operating room. "They got her on a gurney, things were knocked over in the room and everything, and they took her out of the room, down to the surgical room."

While Mrs. Hurlbut was in surgery, her husband inquired of one of the nurses how she was doing. Mrs. Hurlbut was fine but the baby was reported as "not so good." Later, Louis saw the baby wheeled out of the operating room and into the nursery with three attendants administering oxygen. He went into the nursery and held his daughter's hand while she was suctioned for meconium. "I didn't know at this time that she was going to be like this and I started talking to her and telling her it would be all right."

Although the events described here were tragic, and undoubtedly caused a great deal of suffering for the parents, the facts do not justify a verdict under a *Dillon* v. *Legg* theory.

Recovery is permitted where "there is observation of the defendant's conduct and the child's injury and contemporaneous awareness the defendant's conduct or lack thereof is causing harm to the child, . . ." (*Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159, 170 [216 Cal.Rptr. 661, 703 P.2d 1].) There was no evidence of such "awareness" here.

The most that can be said is that certain experiences allowed the parents to "deduce" that some problem or injury had or would damage their child. There was no direct perception of injury. There is no evidence of any contemporaneous awareness that defendant's conduct was the cause of the prospective harm. It was not until after the fact that observations of the

infant confirmed some injury. In *Ebarb* v. *Woodbridge Park Assn.* (1985) 164 Cal.App.3d 781, 785 [210 Cal.Rptr. 751], plaintiff argued that she was not required to be a percipient witness so long as she perceived the event "even if by deduction." The court concluded that plaintiff's deduction that her brother was dead based on the conduct of others was "not the type of 'perception' of the accident which allows recovery. It is merely a perception of the result of the accident, i.e., an example of 'learning of the accident from others after its occurrence.'" (*Ibid.*)

Similarly, although the Hurlbuts personally witnessed events in a way not demonstrated by the *Ebarb* plaintiff, their perception of the injury produced by defendant's negligence can only be characterized as a "deduction" or "inference" rather than a sensory perception. Courts have generally held that "some type of sensory perception of the impact contemporaneous with the accident is necessary to meet the *Dillon* requirement." (*Arauz* v. *Gerhardt* (1977) 68 Cal.App.3d 937, 949 [137 Cal.Rptr. 619].)

Although plaintiffs argue that the decision in *Justus* v. *Atchison* (1977) 19 Cal.3d 564 [139 Cal.Rptr. 97, 565 P.2d 122] is not determinative, or that its viability is in question since the *Ochoa* decision, it is not only as factually similar to the instant case as any available in California, but the statements of law therein are controlling.

In *Justus,* the Supreme Court upheld the sustaining of demurrers and dismissal of causes of action by fathers seeking to recover for shock resulting from their having watched the deliveries of their stillborn infants. The appeal arose from two factually similar actions for medical malpractice and wrongful death.

"Each plaintiff husband asserts he was present in the delivery room and in close proximity to his wife, and observed the defendants ministering to the latter. Plaintiff Jeffrey A. Justus then alleges he saw the manipulation of the fetus with forceps and by hand, and the emergency procedures performed on his wife in connection with the attempted Caesarian section. In his complaint, plaintiff Robert F. Powell alleges he was aware of the diminution of the fetal heart tones and observed the nurse's anxiety at her inability to monitor them, and was further aware of the resulting emergency and the failure of the doctor to respond promptly when called. Each of these plaintiffs then asserts he saw the prolapsing of the umbilical cord of the fetus (see fn. 3, *ante*) and the pain and trauma of his wife. Finally, each alleges he was present when the attending physician announced that the fetus had died." (*Justus* v. *Atchison, supra,* 19 Cal.3d 564, 584.)

These allegations state a case closer to the *Dillon* boundaries than that considered here. Nevertheless, the court rejected the claims for emotional distress under a *Dillon* theory, finding that the accident which caused injury

did not simultaneously shock the fathers. "[A]lthough each plaintiff was in attendance at the death of the fetus, that event was by its very nature hidden from his contemporaneous perception: . . ." (*Justus* v. *Atchison, supra,* 19 Cal.3d at p. 584.)

"Yet his anxiety did not ripen into the disabling shock which resulted from the death of the fetus until he was actually informed of that event by the doctor; prior to that moment, as a passive spectator he had no way of knowing that the fetus had died. In short, the impact derived not from what he saw and heard during the attempted delivery, but from what he was told after the fact. As we have seen, however, a shock caused by 'learning of the accident from others after its occurrence' (68 Cal.2d at p. 741) will not support a cause of action under *Dillon.* [Citation.]" (19 Cal.3d at p. 585.)

The *Justus* court took into consideration the "ever-present possibility of emotional distress" arising from complications of childbirth, refusing to extend the *Dillon* rule into the "operating amphitheater" under the circumstances. (*Justus* v. *Atchison, supra,* 19 Cal.3d at p. 585.) Here too, an extension of the *Dillon* rule to allow recovery for negligent infliction of emotional distress would pave the way for bystander causes of action each time a relative witnesses, in some fashion, the development of surgical complications resulting in anxious medical personnel, hurried emergency procedures, and after-the-fact observations of injury. As noted in *Andalon* v. *Superior Court* (1984) 162 Cal.App.3d 600, 608 [208 Cal.Rptr. 899], "The import of *Justus* is clear: *Dillon* is not the harbinger of a boundless new tort of negligent infliction of emotional distress. Rather, it is a unique wrinkle in the law of tort which is limited by its criteria to a parent transfixed with horror at the sight of an injury happening to his or her child."

In *Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159, plaintiff alleged she was an eyewitness to the refusal of defendants to provide necessary medical attention to her acutely ill son, who was in their custody. The court held that as a percipient witness to both defendants' negligence and the harm thereby inflicted on her child, she was a proper *Dillon* bystander plaintiff. Plaintiff was aware of the connection between defendants' conduct and her child's injury. The court did not require an injury resulting from a "brief and sudden occurrence viewed contemporaneously by the plaintiff." (*Ochoa, supra,* at p. 167.) The recognition of a cause of action stemming from a course of conduct rather than a sudden occurrence was the only relaxation of the second guideline of *Dillon* requiring shock from a sensory and contemporaneous observance of an accident. *Ochoa* disapproved *Justus* only to the extent that dictum in *Justus* would have precluded a *Dillon* cause of action where a plaintiff is voluntarily at the scene of a traumatic event. (*Ochoa, supra,* at p. 171.)

Plaintiffs' reliance on case law analyzing the right to recover under a "direct injury" or *Molien* theory is misplaced. Such a theory was never raised at the trial level. The judgment awarding Tina Hurlbut and Louis Hurlbut $250,000 each for negligent infliction of emotional distress must be reversed.

## II

*Whether the Trial Court Erroneously Refused a Belated Request to Include Three Additional Questions in the Special Verdict Form Calling for a Determination as to the Liability of Drs. Hay and Teel*

■ Jurors were presented with a lengthy special verdict form, including the following inquiry:

"QUESTION NO. 16: Assuming that 100% represents the total negligence which was the proximate cause of the injury to the plaintiff, Rose Marie Hurlbut, what percentage of this 100% is due to the negligence of defendant, SONORA COMMUNITY HOSPITAL and all other persons?

"ANSWER:
To defendant, SONORA COMMUNITY HOSPITAL _____ %
Other person, _____ _____ %
         (Identify)
                         TOTAL _____ %"

The jury retired for deliberations on Friday, July 31, at 11:10 a.m. The following Monday afternoon, the jury presented a written inquiry to the court: "What is the significance of the Question #16?" Even before this inquiry, defense counsel believed the jury was confused by the concept of apportionment of fault and worried that the jury might erroneously assume that Hospital was vicariously liable for the negligence of Drs. Teel and Hay. Defendant sought to add three questions to the special verdict form requiring specific findings as to (1) the negligence of Terry Atencio (the attending nurse), (2) the negligence of Drs. Hay and Teel, and (3) whether any verdict against Hospital was based on the negligence of these individuals.

The trial court refused these additional inquiries, finding there was no evidence or argument presented concerning the negligence of Drs. Teel and Hay, or that Hospital could be responsible for their negligence. The court responded to the jury's question by advising as follows: "In the event that other persons besides the defendant Sonora Community Hospital are determined by the jury to be negligently responsible for injury to the plaintiffs, it is possible that such a percentage allocation would reduce the defendant's

total obligations [*sic*] for non-economic damages. This is an advisory question. The law is not settled as yet in this area." The written response was signed by attorneys for both sides. The jurors shortly thereafter returned a verdict attributing 100 percent fault to Hospital.

Defendant contends that this "clarification," coupled with the vague language of question 16 and plaintiffs' closing argument, misled the jury. A juror declaration purportedly supporting this contention is a part of the record.

Defendant complains specifically of plaintiffs' argument that Hospital was negligent in not requiring independent contractors, under the terms of their agreements with Hospital, to be available for emergency surgery within 30 minutes of contact.

■ Plaintiffs argue that the belated request for additional special findings is precluded by California Rules of Court, rule 230. That rule provides that written issues or questions of fact upon which findings are requested "shall" be presented to the judge "before argument, unless otherwise ordered. . . ." Here, the request occurred after the jury had begun deliberations. No objection to the request on this ground appears in the record, and plaintiffs have therefore waived this objection on appeal.

In all cases, the court may direct the jury to find a special verdict in writing. (Code Civ. Proc., § 625.) ■ The purpose of special interrogatories is to test the validity of the general verdict by determining whether all facts essential to the verdict were established to the satisfaction of the jury. No party has a right to submission of special interrogatories. The procedure is discretionary with the court, and a showing of abuse of discretion is necessary to make the refusal of a request reversible error. (7 Witkin, Cal. Procedure, (3d ed. 1985) Trial, §§ 321, 323-324, pp. 322, 324-325.) The appellate court will not substitute its own view as to the proper decision. (9 Witkin, Cal. Procedure, *op. cit. supra*, Appeal, § 275, p. 286.) ■ "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge. To be entitled to relief on appeal from the result of an alleged abuse of discretion it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice; . . ." (*Brown* v. *Newby* (1940) 39 Cal.App.2d 615, 618 [103 P.2d 1018].)

■ Defendant fails to establish an abuse of discretion or miscarriage of justice below. There was no real issue of the comparative fault of Drs. Hay and Teel raised during the trial. When one of plaintiffs' medical experts was asked a hypothetical question about what Dr. Teel might have done "operating within the standard of care," the trial court stated, "But Dr. Teel is not—his conduct is not in issue." When defendant objected to another

hypothetical question arguably calling for an assessment of what Dr. Teel would have done, the judge stated, "Dr. Teel's role in this is pretty much as a witness and he's not, certainly not being assessed . . . and the jury I believe by now understands that we're not trying to assess the blame of Dr. Teel. We're trying to assess the blame, if any, of the defendants Sonora Community Hospital and its employees . . . ." Defendant made no objection to these statements by the court.

In closing argument, plaintiffs' counsel discussed question No. 16: "[B]ut it's assuming 100 percent represents the total negligence. Well, the only person that's accused of being negligent is Sonora Community Hospital. And it's the only defendant we've introduced evidence on." In response, defense counsel argued that under a certain hypothetical, Dr. Teel should have come to the hospital earlier which might constitute some percentage of negligence. He argued that common sense suggested Drs. Teel and Hay could be negligent under the evidence.

Defendant conceded in argument that nurse Atencio was the agent of Hospital and acting in the course and scope of employment in doing the things complained of. Defendant pointed out that Dr. Hay was not an employee but an independent contractor with Hospital. The jury was instructed that the defendant was responsible for the conduct of nurse Atencio, but received no similar instruction concerning the physicians.

There was expert testimony that Dr. Teel's conduct could not be criticized. No expert testified that Dr. Teel's conduct was beneath the standard of care. No expert testified that Dr. Hay's conduct was beneath the standard of care. The jury was instructed to determine the standard of care required of physicians and nurses "only from the opinions of the physicians who have testified as expert witnesses as to such standard." Defendant did not request a jury instruction on comparative fault and question No. 16 should not have been submitted to the jury. Defendant does not contend it was prejudiced by the submission of the apportionment of fault issue to the jury, but only that the trial court should have allowed the additional specific findings.

Under the circumstances, it was not an abuse of discretion to conclude that the record provided insufficient evidence of negligence on the part of Drs. Teel and Hay to justify the additional special findings.

Finally, defendant argues that the court's response to the jury inquiry was improper and prejudicial. The written response was signed by defense counsel, and there is nothing in the record evidencing an objection to that response. The absence of objection and apparent approval of the response constitutes an implied waiver of any claim of error on appeal. (9 Witkin, Cal. Procedure, *op. cit. supra,* Appeal, § 307, p. 317.)

## III

*Whether Defendant Hospital Was Entitled to Make Periodic Payments of the $350,000 Future Income Loss Award Pursuant to Code of Civil Procedure Section 667.7*

The jury rendered a special verdict in favor of Rose Marie Hurlbut in the amount of $350,000 for future loss of earnings.[1] After the special verdict was returned, the trial court instructed the parties to submit a proposed judgment. Hospital requested the judgment provide for monthly payments of $36,892 commencing at age 18 and payable through Rose Marie's life expectancy of 27.5 years or death to compensate for future earnings losses. Defendant argued that pursuant to the terms of Code of Civil Procedure section 667.7, periodization of the payment of the award is mandatory. Judgment was entered in the lump sum of $350,000, and defendant again sought periodic payments in its motion for new trial. The request was denied.

Code of Civil Procedure section 667.7 provides that when a plaintiff in a medical malpractice action sustains "future" damages of $50,000 or more, compensation for those damages is to be paid periodically, over the course of time the losses are incurred, rather than in a lump sum payment. That section requires the trial court, on motion of either party, to enter judgment accordingly.

Plaintiffs argue that defendant's failure to request periodic payments prior to verdict essentially precluded the jury from making findings which would allow the trial court to structure an appropriate payment schedule. Plaintiffs further argue that defendant is not entitled to make periodic payments for that portion of losses attributable to the diminution in Rose Marie Hurlbut's life expectancy.

Ordinarily, under Code of Civil Procedure section 667.7, when a medical malpractice action results in an award for future damages, the trial court *must* order periodic payments on request. (*Fein* v. *Permanente Medical Group* (1985) 38 Cal.3d 137, 154-155 [211 Cal.Rptr. 368, 695 P.2d 665].) However, where damages for future loss of earnings are concerned, a limited exception to the rule has been recognized.

In *Fein,* the Supreme Court held that a proper element of the plaintiff's damages was an award of $700,000 "for the loss of earnings attributable to plaintiff's so-called 'lost years,' i.e., the period of time by which his life

---

[1] It is apparent from the record that the $350,000 is a *present value* figure. The jury was repeatedly instructed to award the present cash value of future lost earning capacity. Plaintiffs' expert economist testified in terms of present value of future lost earnings, and in argument to the jury, plaintiffs' counsel requested a present value award.

expectancy was diminished as a result of defendant's negligence." (*Fein* v. *Permanente Medical Group, supra,* 38 Cal.3d at p. 153.) The court then held that such a "lost years" award is only partially subject to periodic payments and it is the defendant's burden to propose special findings apportioning the lost-years earnings: "Although in general lost future earnings are a type of future damage particularly suitable to a periodic payment judgment, this case presents a somewhat unusual situation because the damages awarded are solely attributable to the earnings of plaintiff's lost years. If the trial court had ordered such damages paid periodically over the time period when the loss was expected to be incurred, the damages would have been paid in their entirety *after* plaintiff's expected death, and thus—if the life expectancy predictions were accurate—plaintiff would not have received *any* of this element of damages. Had defendant presented evidence by which the jury could have determined what proportion of the lost years' earnings would likely be spent for the support of plaintiff's dependents rather than plaintiff himself [citation], and had it raised the periodic payment issue in a timely fashion so that the jury could have made special findings on that question, there might well be a strong argument that the dependents' share of the lost years' earnings should be subject to periodic payment. In the absence of any such apportionment, however, we conclude that the trial court properly determined that section 667.7 did not call for the periodic payment of this element of plaintiff's award." (*Id.* at pp. 156-157.)

Rose Marie Hurlbut is entitled to lost earnings resulting from disability during her lifetime (i.e., from the age of 18 through 27.5 years) as well as lost-years damages. The portion of the award stemming from disability rather than premature death would be subject to periodic payments under Code of Civil Procedure section 667.7. Although defendant here did secure a special finding as to the amount of future lost earnings, no evidence was presented nor special findings sought on apportionment of the future lost earnings. The trial court, therefore, had no way to apportion the award between lost years and lifetime disability in order to structure an appropriate judgment for periodic payments. Although plaintiffs' expert economist testified concerning average work-life expectancy, it is impossible to determine whether the jury awarded damages for losses during Rose Marie's lifetime only, as defendant argued was proper, or for the entire period of her normal expected work life as suggested by the economist.

Defendant points to plaintiffs' settlement conference statement as establishing plaintiffs' notice of Hospital's intention to seek periodic payments under Code of Civil Procedure section 667.7. In fact, that statement is more properly construed as notice to defendant of plaintiffs' intent to challenge periodic payments if requested. Additionally, prior to closing arguments, the parties stipulated that the court would provide for periodic payment of any award for future medical expenses pursuant to Code of Civil Procedure

section 667.7. No mention was made concerning a similar structure for future lost earnings. "Notice," however, is not the issue. *Fein* clearly places the burden on the defendant to propose the necessary special findings.

The importance of special findings in this context was highlighted in *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 377 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233]. "[P]articularly when the elements of future damage are in dispute—we think trial courts would be well advised to permit liberal use of the special verdict procedure so that the individual components of the jury's future damage award can be ascertained and the periodic payment schedule can be knowledgeably established."

Insufficient special findings having been proposed by defendant in this case, the trial court properly ordered the entire $350,000 award for future loss of earnings paid in a lump sum under the judgment.

IV

*Whether Plaintiffs' Code of Civil Procedure Section 998 Demand Was Valid, Allowing Plaintiffs' Recovery of Expert Witness Fees*

On June 25, 1987, plaintiffs jointly served Hospital with an offer to compromise pursuant to Code of Civil Procedure section 998. The terms of the offer, stated in alternatives, were as follows: "1. Cash payment in the amount of $499,000.00; and [¶] 2. Monthly payments beginning at the time of settlement and continuing for the life of Rose Hurlbut a minor, in the amount of $17,000 per month, increasing at the rate of 4% per annum beginning at the conclusion of the first year following the date of settlement. Said payments will cease at the conclusion of the life of Rose Hurlbut. [¶] As an alternative to the above payment, plaitniffs, [*sic*] collectively, under the terms of this offer, hereby offer to settle the entire case against Sonora Community Hospital ONLY for the cash payment amount of $1,900,000.00. [¶] The election of defendant, Sonora Community Hospital, may accept and pay either alternative payment set out above under the terms of this offer to compromise."

The offer was not accepted by defendant.

Subsequent to trial, plaintiffs filed an amended cost bill seeking, among other things, reimbursement for expert witness fees and costs totaling approximately $52,000.

A prevailing party may be entitled to expert witness fees pursuant to the terms of Code of Civil Procedure section 998. That section provides in pertinent part: "(d) If an offer made by a plaintiff is not accepted and the

defendant fails to obtain a more favorable judgment, the court in its discretion may require the defendant to pay a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, the preparation or trial of the case by the plaintiff, in addition to plaintiff's costs."

Defendant filed a motion to strike the cost bill, challenging plaintiffs' right to expert witness fees on the ground that the Code of Civil Procedure section 998 offer was not in compliance with statutory requirements and "void *ab initio*." The court issued an order denying expert witness expenses. "In view of the fact of [*sic*] the conditional grant of new trial has reduced the judgment by some $500,000.00 the total cost bill for expert witnesses testimony cannot now be recovered and therefore costs set forth in Paragraph IV, 1 through 25 will be disallowed." Plaintiffs filed a motion for reconsideration of the order, arguing that even with the reduction of the judgment by $500,000 (conditional new trial order), the judgment was more favorable than the statutory offer of compromise. Plaintiffs calculated the value of the judgment at more than $2.4 million, substantially in excess of the second alternative offered under Code of Civil Procedure section 998. Plaintiffs did not address the value of the first alternative.

Upon reconsideration, the court ordered payment of plaintiffs' expert witness costs. The trial court applied Code of Civil Procedure section 998 relying on general contract law favoring enforcement of indefinite contracts where uncertain terms can be rendered definite by the introduction of evidence. (*McIllmoil* v. *Frawley Motor Co.* (1923) 190 Cal. 546, 549 [213 P. 971].) However, the purpose of giving effect to the "reasonable intentions" of the parties is inapposite where there is no agreement but an offer only and not an acceptance. Further, there is no record from which it can be determined that the uncertain terms of the offer were made definite.

The purpose of Code of Civil Procedure section 998 is to encourage the settlement of lawsuits before trial. (*T. M. Cobb Co.* v. *Superior Court* (1984) 36 Cal.3d 273, 280 [204 Cal.Rptr. 143, 682 P.2d 338].) Code of Civil Procedure section 998 achieves its purpose by punishing a party who fails to accept a *reasonable* offer from the other party. (*Culbertson* v. *R. D. Werner Co., Inc.* (1987) 190 Cal.App.3d 704, 711 [235 Cal.Rptr. 510].) "As a general rule, the reasonableness of a defendant's offer . . . represents a reasonable prediction of the amount of money, if any, defendant would have to pay plaintiff following a trial, . . ." (*Elrod* v. *Oregon Cummins Diesel, Inc.* (1987) 195 Cal.App.3d 692, 699 [241 Cal.Rptr. 108].)

Code of Civil Procedure section 998 makes no provision for a structured settlement offer, and there is no case law interpreting this section in light of such an offer. Plaintiffs' offer included a structure involving a

lump sum payment and a monthly annuity for the life of the plaintiff. There are no citations to the record indicating evidence was presented or findings made as to the present value of the structure. Absent such findings, it is impossible to determine whether plaintiffs achieved a more favorable judgment at trial, making the Code of Civil Procedure section 998 offer unenforceable.

In *Valentino* v. *Elliott Sav-On Gas, Inc.* (1988) 201 Cal.App.3d 692 [247 Cal.Rptr. 483], the court held that costs cannot be shifted under Code of Civil Procedure section 998 where the offer to compromise includes relinquishment of claims not raised in the complaint. The court found that the terms of the offer made it difficult to accurately assess its monetary value preventing the court from "fairly" determining whether the damage award is more favorable or less favorable than the statutory offer. "It has introduced an imponderable which makes it impractical if not impossible to accurately and fairly evaluate the offer." (*Valentino, supra,* at p. 699.)

Here, monthly payments, slated to increase by 4 percent per annum and to terminate with the death of Rose Marie Hurlbut, cannot be evaluated without findings as to present value. Such findings necessarily require expert testimony. Plaintiffs offered no evidence of the present value of their offer in seeking costs and clearly had the burden of showing a more favorable judgment had been reached. (*Morin* v. *ABA Recovery Service, Inc.* (1987) 195 Cal.App.3d 200, 209 [240 Cal.Rptr. 509].) Having failed to present evidence sufficient to establish the present value of the structured settlement offer, plaintiffs may not take advantage of the benefits offered under Code of Civil Procedure section 998.

The difficulty in determining the value of the settlement offer is no less fatal to a determination of what constitutes a more favorable judgment than is the joint nature of the offer by the three plaintiffs. Such an offer precludes a determination of whether *each* plaintiff received a judgment more favorable than the offer.

Plaintiffs contend that *Randles* v. *Lowry* (1970) 4 Cal.App.3d 68 [84 Cal.Rptr. 321] is inapplicable because it involves an offer from a defendant to multiple plaintiffs rather than an offer generated by plaintiffs. However, the principle is the same. In *Randles,* the defendant offered to settle the severable causes of action of three plaintiffs for a total of $2,330 pursuant to Code of Civil Procedure section 997 (predecessor to section 998). At trial, three plaintiffs received damage awards totaling less than the offer. Nonetheless, the court refused to shift defendant's costs, finding it "impossible to say that any one plaintiff received a less favorable result than he would have under the offer of compromise." (*Randles, supra,* at p. 74.)

The situation here is similar. Unlike the cases sanctioning a plaintiff's joint offer to multiple defendants where they are held to be jointly and severally liable for the total judgment (*Hilliger* v. *Golden* (1980) 107 Cal.App.3d 394, 399-400 [166 Cal.Rptr. 33]; *Brown* v. *Nolan* (1979) 98 Cal.App.3d 445, 451 [159 Cal.Rptr. 469]), plaintiffs' interests were not identical. There was no single, indivisible injury to evaluate for settlement purposes.

Code of Civil Procedure section 998 speaks in the singular—"any party may serve an offer . . . ." This language has been interpreted to apply to a joint offer to defendants only where sued under a theory of joint and several liability. (*Brown* v. *Nolan, supra,* 98 Cal.App.3d 445, 451.) This exception to the strict language of the statute is not applicable here.

To consider plaintiffs' joint settlement offer as valid would deprive defendant of the opportunity to evaluate the likelihood of each party receiving a more favorable verdict at trial. Such an offer makes it impossible to make such a determination after verdict. We hold that the joint settlement offer presented by plaintiffs was not a valid settlement offer under Code of Civil Procedure section 998 and the order after judgment directing defendant to pay to plaintiffs certain expert witness fees must be reversed.

## CROSS-APPEAL

Because this court has found a lack of substantial evidence to support the jury's award of damages to Tina Hurlbut and Louis Hurlbut for negligent infliction of emotional distress, all issues raised in plaintiffs' cross-appeal are rendered moot.

## DISPOSITION

The following quoted parts of the judgment are reversed:

"FIFTH
Defendant shall pay to Plaintiff TINA HURLBUT the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) for noneconomic damages.

"SIXTH
Defendant shall pay to Plaintiff LOUIS HURLBUT the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) for noneconomic damages."

The "ORDER DIRECTING PAYMENT OF EXPERT WITNESSES' FEES" dated October 28, 1987, is reversed.

The judgment is affirmed in all other respects.

The parties to bear their own costs on appeal.

Martin, Acting P. J., and Ardaiz, J., concurred.