[No. B070149. Second Dist., Div. Seven. May 25, 1994.]

GERALD SANTANTONIO, Plaintiff and Appellant, v.
WESTINGHOUSE BROADCASTING COMPANY, INC., et al.,
Defendants and Respondents.

COUNSEL

Inman, Weisz & Steinberg, Drew E. Pomerance and Hali E. Ziff for Plaintiff and Appellant.

Hill, Farrer & Burrill, Kyle D. Brown, Jack R. White and Ronald W. Novotny for Defendants and Respondents.

OPINION

**WOODS (Fred), J.—**

## I.

### INTRODUCTION

Plaintiff and appellant, Gerald Santantonio (Santantonio), appeals from an award of costs against him in the sum of $96,883.12, following his unsuccessful suit against defendants and respondents.

## II.

### FACTUAL AND PROCEDURAL SYNOPSIS

Santantonio and two other plaintiffs, Gerald A. Velona (Velona) and Joseph R. Cochrane (Cochrane), were former account executives employed by Los Angeles radio station KFWB, owned by defendant and respondent Westinghouse Broadcasting Company, Inc. (WBC). Santantonio and Velona claimed that they were terminated by KFWB because of their age. Cochrane claimed that age discrimination forced him to leave KFWB for another job which did not pay as well. Plaintiffs also sued WBC's parent corporation, Westinghouse Electric, Inc., and two managerial employees of KFWB, Jack Hutchison (Hutchison) and Joanne Cunha (Cunha). Cunha was dismissed as a defendant at the start of the trial.

On September 6, 1991, defendants served on plaintiffs' counsel an "offer to compromise," pursuant to Code of Civil Procedure section 998[1] as follows:

"Pursuant to C.C.P. § 998, defendants Westinghouse Broadcasting Co., Westinghouse Electric, Inc., Jack Hutchison, and Joanne Cunha hereby offer

---

[1]Unless otherwise stated, all statutory references are to the Code of Civil Procedure.

that plaintiffs Gerard Velona, Joseph Cochrane, and Jerry Santantonio take judgment against them in the following amounts:

"1. That plaintiff Velona take judgment against defendants in the amount of $100,000, exclusive of taxable costs incurred to the date of judgment;

"2. That plaintiff Cochrane take judgment against defendants in the amount of $100,000, exclusive of taxable costs incurred to the date of judgment; and

"3. That plaintiff Santantonio take judgment against defendants in the amount of $100,000, exclusive of taxable costs incurred to the date of judgment.

"Pursuant to C.C.P. § 998(b), this offer shall remain open for a period of thirty (30) days, during which time plaintiffs may file a proof of acceptance of the judgment and the court may enter judgment accordingly."

It is undisputed that the offer to compromise was rejected by plaintiffs.

Following a lengthy jury trial, the trial judge granted a motion for directed verdict in favor of Westinghouse Electric, Inc. On February 13, 1992, the jury then returned verdicts in favor of WBC and Hutchison as to the claims of Santantonio and Velona. The jury also returned a verdict in favor of WBC on Cochrane's claim against it, but found in favor of Cochrane on his claim against defendant Hutchison. The jury awarded Cochrane past economic damages in the sum of $85,000 and emotional distress damages in the sum of $100,000. The trial judge then awarded Cochrane an additional sum of $68,844 for future economic losses.[2]

In posttrial proceedings, Cochrane was also awarded costs in the sum of $3,220.60 and attorney fees of $176,962, for a total judgment of $434,026.60. Additionally, the trial court granted Cochrane's motion for judgment notwithstanding the verdict against WBC, thereby making WBC jointly and severally liable for the damages awarded against Hutchison. On April 23, 1992, the judgment was amended to reflect the aforementioned posttrial rulings.

On February 28, 1992, defendants filed a memorandum of costs claiming $365,948.21 as recoverable costs against all of the plaintiffs. Plaintiffs moved to strike and tax defendants' memorandum of costs. Before the hearing on plaintiffs' motion to strike and tax costs, Velona filed a petition

---

[2]The issues regarding damages were bifurcated. The issue of plaintiffs' "past economic damages" (lost compensation and benefits up to the time of trial), if any, was submitted to the jury. The issue of whether a plaintiff could also recover projected "future economic losses" was reserved for decision by the court.

in bankruptcy and the trial court granted Cochrane's motion for judgment notwithstanding the verdict against WBC. In view of these developments before the hearing, defendants conceded that an allocation of costs only against Santantonio was being sought.

On May 20, 1992, the court made an order reflecting rulings on various pending posttrial motions and issues, including the matter of costs. At the request of Santantonio's counsel, a further order was made on June 1, 1992, to clarify certain parts of the May 20 order. As a result of the May 20 and June 1 orders, defendants were awarded costs against Santantonio in the sum of $96,883.12, consisting of the following:

| Description | Total Allowed | Amount Allocated to Santantonio |
| --- | --- | --- |
| Cost Mem. Items 1(a) [Filing & motion Fees], (b) [Jury Fees] and (3) [Deposition Costs] | 9,035.28 | 3,015.09 |
| Cost Mem. Item 7(a)(5) [Ordinary Witness Fees] | 3,332.66 | 1,110.89 |
| Cost Mem. Item 7(c) [Expert Fees per § 998] (1), (2) depositions of plaintiffs' experts, Joyce Pickersgill and Richard Eastin. | 776.08 | 266.72 |
| (3) Finis Welch. | 47,162.50 | 15,720.83 |
| (4) Michael Ward. | 40,668.75 | 13,556.25 |
| (5) Support Fees and Expenses for Welch, Ward. | 179,629.75 | 59,867.58 |

| | | |
|---|---|---|
| Cost Mem. Item 10 [Projector rental $884.84; experts' exhibits $8,744.45; photocopying exhibits $408]. | 10,037.29 | 3,345.76 |
| Total | 290,642.31 | 96,883.12 |

Regarding the expert fees and support costs allowed under section 998, the court explained its reasons as follows:

"The recovery of expert witness fees depends first on whether the CCP 998 offer was valid. Court finds that it was. There existed a sufficient joint interest here in that all defendants were sued jointly on all causes of action. Further, the court relied on a commonality in determining plaintiff's successful motion for judgment notwithstanding the verdict. The amount of the offer was also reasonable based on the substantial evidence of poor performance documented by defendants.

"The question of the reasonableness of the amounts claimed remains. Defendants claim that Mr. Welch is the leading figure in the industry and that his firm was not retained until shortly before trial and that all the preparation and staff time was necessary and reasonable. Court will accept that the status of the two expert witnesses is sufficient enough to justify their fees. Therefore, fees for Mr. Welch are allowed in the amount of $47,162.50 and fees for Mr. Ward are allowed in the amount of $40,668.75. One-third of that amount is payable by Mr. Santantonio; to wit, $29,277.08. However, they seem to have hired some very high-priced talent to perform tasks which require skills that do not appear that awesome. For purposes of allowing staff fees, economists will be reimbursed at $75.00 per hour, programmers at $75.00 per hour, research assistants at $60.00 per hour, data entry clerks at $12.00 per hour and photocopy people at $8.00 per hour. If the calculations are correct, those allowable costs for staff time amount to $179,629.75, one-third of which is $59,867.58."

## III.

### APPELLANT'S CONTENTIONS

Santantonio attacks the judgment on the ground that the trial court improperly awarded costs under section 998 and, in any event, abused its

discretion as to the particular items and amounts which were allowed. As hereinafter discussed, there is no merit to these contentions.

## IV.

### DISCUSSION

A. *Defendants' Section 998 Offer Was Valid.*

Santantonio's principal contention is that the trial court should not have awarded any costs under section 998, on the ground that defendants' offer to compromise was not valid.[3] In summary, Santantonio states three basic reasons for his contention: (1) the offer only provided for acceptance by plaintiffs jointly; (2) it was made jointly by defendants who are not united in interest; and (3) it was not intended to be a realistic offer to each plaintiff, but rather to provide a basis to shift litigation costs to plaintiffs under the guise of expert fees.

1. *The Section 998 Offer Did Not Require Acceptance by All Plaintiffs. In Any Event, This Issue Has Been Raised for the First Time on Appeal and Should Not Be Considered.*

■ Santantonio correctly points out that under interpretative decisions, a section 998 offer made to multiple parties is valid only if it is expressly apportioned among them and not conditioned on acceptance by all of them. (See, e.g., *Randles* v. *Lowry* (1970) 4 Cal.App.3d 68, 74 [84 Cal.Rptr. 321]; *Meissner* v. *Paulson* (1989) 212 Cal.App.3d 785, 791 [260 Cal.Rptr. 826]; *Hutchins* v. *Waters* (1975) 51 Cal.App.3d 69, 73 [123 Cal.Rptr. 819]; *Taing* v. *Johnson Scaffolding Co.* (1992) 9 Cal.App.4th 579, 586 [11 Cal.Rptr.2d 820].) A single, lump sum offer to multiple plaintiffs which requires them to agree to apportionment among themselves is not valid. (*Randles* v. *Lowry, supra*, 4 Cal.App.3d at p. 74.) Likewise, a lump sum offer by a plaintiff to multiple defendants may be invalid for the same reasons. (*Taing* v. *Johnson Scaffolding Co., supra*, 9 Cal.App.4th at p. 586.)

■ The instant case does not involve a lump sum or unapportioned offer. Rather, since defendants expressly offered $100,000 to each plaintiff, the plaintiffs did not have to agree among themselves as to how the offer would be apportioned. Santantonio concedes as much, but argues that this case is like *Hutchins*.

---

[3] This contention by Santantonio necessarily involves only the costs awarded for "expert fees" claimed in item 7(c) of defendants' memorandum of costs. Costs were also awarded against Santantonio under items 1(a) and (b), 3, 7(a) and 10 of defendants' memorandum in the aggregate amount of $7,471.74. Those costs are allowable under section 1033.5 irrespective of whether defendants' section 998 offer was valid.

In *Hutchins*, two plaintiffs sued one defendant for damages arising out of an automobile accident. The defendant made a section 998 offer to both plaintiffs for an aggregate sum which was expressly apportioned between the two of them. But the offer also expressly provided that neither plaintiff could accept unless the other also accepted. The court held that the offer was invalid because section 998 does not contemplate that kind of "conditional settlement offer" to two plaintiffs "to become effective only if accepted by both." (Italics deleted.) (*Hutchins* v. *Waters, supra,* 51 Cal.App.3d at p. 73.)

The offer made by defendants in this case is distinguishable from the one made in *Hutchins*. Nothing in defendants' offer specifically stated that the $100,000 offered to Santantonio, individually and by name, could be accepted by him only if the other two plaintiffs accepted their offers. We discern that Santantonio is really suggesting that the offer made in this case should now be judicially construed as *impliedly* imposing a condition that all three plaintiffs were required to accept, since the offer did not expressly provide that the plaintiffs could accept separately. We decline the invitation to imply such a condition.

■ Initially, it should be noted that the record on appeal does not reveal that this issue was raised in the trial court. In his moving papers in the trial court, the only grounds asserted by Santantonio for his claim that the section 998 offer was invalid were that "there was no unity of interest between defendants Westinghouse Electric and Westinghouse Broadcasting and thus no possible joint or respondeat superior liability," and "the § 998 offers to plaintiffs were invalid because they were not reasonable or good faith offers." The record reveals that those two points only were urged by Santantonio's trial counsel during oral argument on Santantonio's motion to tax costs. Having failed to raise the issue in the trial court, the issue was waived, and we will not consider it for the first time on appeal. (*Evers* v. *Cornelson* (1984) 163 Cal.App.3d 310, 315 [209 Cal.Rptr. 497].)

■ Secondly, Santantonio has cited no case which supports his present interpretation of defendants' offer, and we note that such an interpretation would not serve the policy of section 998. The purpose of the statute is to encourage settlements, and it "achieves its aim by punishing a party who fails to accept a *reasonable* offer from the other party." (Original italics.) (*Elrod* v. *Oregon Cummins Diesel, Inc.* (1987) 195 Cal.App.3d 692, 698-699 [241 Cal.Rptr. 108].) A reasonable inference from the record is that Santantonio rejected the offer by defendants because he and his counsel considered it to be far too low, and not because they thought he was precluded from accepting unless the other two plaintiffs also agreed to take $100,000. We note that Santantonio reiterates all of the reasons why he did not consider the

$100,000 offer to him to be reasonable. The comments of his counsel during oral argument in the trial court reflect similar reiterations.

Accordingly, we infer that Santantonio is attempting to avoid the cost shifting purpose behind section 998 based on a claimed procedural defect devised by his appellate counsel for the first time on appeal. If the statutory purpose behind section 998 is to be served in this case, we cannot permit Santantonio to avoid the consequences of his decision by claiming now that the offer ought to be construed as one which he could not have accepted anyway. Such a construction would be strained, and we decline to do so.

## 2. *It Was Proper for Defendants to Make a Joint Offer.*

■ Santantonio next contends, as he did below, that defendants' offer was invalid because it was jointly made. He asserts that a joint offer by multiple defendants is not permissible "unless the Defendants' interests are identical and indivisible, referred to in the case law as unity of interest." Based on that view of the law, he concludes the defendants' joint offer was rendered invalid because defendant Westinghouse Electric was granted a directed verdict on the ground that it had no joint or respondeat superior liability.

Santantonio is mistaken. The case of *Hurlbut* v. *Sonora Community Hospital* (1989) 207 Cal.App.3d 388 [254 Cal.Rptr. 840], cited by Santantonio, involved a suit by parents and a child against a hospital for injuries resulting from the hospital's alleged negligent failure to perform a timely caesarean section procedure. The plaintiffs' joint section 998 offer to the defendant was held to be invalid pursuant to the following reasoning:

"Unlike the cases sanctioning a plaintiff's joint offer to multiple defendants where they are held to be jointly and severally liable for the total judgment [citations], plaintiffs' interests were not identical. There was no single, indivisible injury to evaluate for settlement purposes." (207 Cal.App.3d at p. 410.)

In the instant case, each plaintiff did claim to have suffered a single, indivisible injury, for which the defendants were alleged to be jointly and severally liable. Hence, the case of *Brown* v. *Nolan* (1979) 98 Cal.App.3d 445 [159 Cal.Rptr. 469], cited by the court in *Hurlbut*, is much more like the instant case and the court's rationale is apposite. In *Brown*, a joint offer by two defendants to a plaintiff was held to be valid under section 998 under the following reasoning:

"The parties to this appeal agree that in this action a single plaintiff sued two defendants on a theory of joint and several liability. 'Contributory

wrongdoers, whether joint tortfeasors or concurrent or successive tortfeasors, are ordinarily jointly and severally liable for the entire damage. [Citations.] [¶] Hence, when they are joined in an action it is improper to apportion compensatory damages among them; judgment for the full amount should be rendered against each.' [Citation.] When the facts of this case are viewed within the context of these general principles it becomes clear that the offer in issue was one contemplated by section 998.

"Plaintiff's argument that if section 998 is strictly construed it cannot be read as providing for joint offers because it speaks in the singular ('any party may serve an offer . . . . If an offer made by a defendant . . . .') is not persuasive. *Where, as here, defendants are sued upon a theory of joint and several liability, each is potentially liable for the full amount of any judgment. Therefore, the offer of compromise in question is properly read as an offer by each defendant to plaintiff that judgment in the amount of $12,500 may be taken against each one of them, jointly and severally.* Thus, the statute's speaking in the singular makes perfect sense when it is applied to defendants sued on such a theory. The trial court erred in holding that section 998 was inapplicable." (98 Cal.App.3d at p. 451, italics added and deleted; fns. omitted.)

To the same effect see *Winston Square Homeowner's Assn.* v. *Centex West, Inc.* (1989) 213 Cal.App.3d 282, 294 [261 Cal.Rptr. 605], where the court upheld a joint section 998 offer as follows: "Joint offers by more than one defendant fall within the provisions of section 998 when defendants are united in interest and are sued on a theory of joint and several liability. [Citations.] Here, all defendants were not united in interest. Nevertheless, the application of section 998 appears appropriate in this case. Though the joint offer did not break down the offer as to particular areas of damage or defendants, Wilsey & Ham received a judgment in its favor. Wilsey & Ham was an absolute prevailing party—it was completely absolved of any liability. As Wilsey & Ham contends, the subsequent settlement between plaintiff and the other defendants on issues other than drainage was irrelevant as far as Wilsey & Ham was concerned." (Fn. omitted.)

Thus, Santantonio misconstrues the application of the cited cases when he suggests that defendants' section 998 offer was rendered invalid when Westinghouse Electric ultimately avoided liability through a directed verdict. Santantonio has not included the pleadings in the appellate record. However, by judicial notice under Evidence Code section 452, subdivision (d), it is seen that all of the defendants, including Westinghouse Electric, were sued on the theory that they were jointly and severally liable for the

alleged age discrimination asserted by all of the plaintiffs, and defendants filed a joint answer to the complaint. Hence, this case is governed by the rationale of *Brown*.[4]

### 3. *The Offer Was Reasonable.*

As a last attack on the validity of defendants' section 998 offer, Santantonio argues that it was not reasonable. Santantonio misconstrues the law.

#### a. *Defendants' offer was prima facie reasonable. Santantonio has the burden of showing an abuse of discretion by the trial court on appeal.*

■ It is true that the courts have held that a good faith requirement must be read into section 998. In *Wear* v. *Calderon* (1981) 121 Cal.App.3d 818 [175 Cal.Rptr. 566], an offer of only $1 by a defendant in a personal injury action was held not to serve the purpose of the statute because there was no chance the plaintiff would accept such a nominal offer to settle the case. Similarly, in *Pineda* v. *Los Angeles Turf Club, Inc.* (1980) 112 Cal.App.3d 53, 62-63 [169 Cal.Rptr. 66], both the trial court and Court of Appeal held that a settlement offer of $2,500 made by a defendant was so disproportionate to plaintiff's demand of $10 million that it was unreasonable to expect that it would be accepted. The Court of Appeal held it was not an abuse of discretion for the trial judge to have denied defendant's claim for expert fees under section 998, even though the defendant was absolved of liability by the jury. (112 Cal.App.3d at p. 63.)

Based on like reasoning, in *Elrod* v. *Oregon Cummins Diesel, Inc.*, *supra*, 195 Cal.App.3d 692, a $15,001 offer by one of several defendants in a case where the plaintiff's personal injury damages ultimately were determined to be in excess of $1 million was found to be an invalid "token" by the trial court, and that determination was upheld by the Court of Appeal. In so doing, however, the Court of Appeal acknowledged the following rules, which are relevant to the instant case as well:

"It is the general rule that where a party shows a prima facie entitlement to costs, the burden is on an objector to prove the costs should be disallowed.

---

[4] It is reasonable to assume that Santantonio has apparently misunderstood the meaning of the words "unity of interest" used in some of the authorities cited herein. It does not mean that there must be a "unity of interest" between a parent corporation and a subsidiary corporation in an alter ego sense. Nor does it mean that the claimed basis for joint and several liability must be sustained or conceded to support the validity of a defendants' joint offer. Rather, it simply means what was being discussed in *Brown*, i.e., that the defendants *were sued* on a theory of joint and several liability. Here, it was claimed that Westinghouse Electric and WBC were, in essence, *joint employers* of the plaintiffs. It would be a strained result to hold that defendants' joint section 998 offer was rendered invalid simply because plaintiffs failed to sustain their claim that Westinghouse Electric was in fact an employer.

[Citations.] Where, as here, the offeror obtains a judgment more favorable than its offer, the judgment constitutes prima facie evidence showing the offer was reasonable and the offeror is eligible for costs as specified in section 998. The burden is therefore properly on plaintiff, as offeree, to prove otherwise.

"Finally, whether a section 998 offer was reasonable and made in good faith is a matter left to the sound discretion of the trial court." (195 Cal.App.3d at p. 700.)

In *Elrod*, facts very different from the instant case led both the trial court and Court of Appeal to conclude that the offer was not good enough to qualify as a reasonable one. The plaintiff had been rendered a paraplegic in a trucking accident. The jury ultimately determined his damage to be $1,183,350, but also determined that he was 60 percent at fault. The defendant who made the $15,001 settlement offer was found to be 10 percent liable. However, the plaintiff's damages ultimately were required to be reduced by a $500,000 settlement received from other defendants and by $137,504 received as workers' compensation benefits. As a result of these fortuitous offsets, the net recovery against the defendant who made the $15,001 offer turned out to be zero. In view of those facts, the Court of Appeal held: "In this case, no abuse of discretion has been shown. The trial court could conclude plaintiff carried his burden of proving that, at the time the offer was made, it was not a reasonable prediction of the amount Cummins would have to pay plaintiff following a trial." (195 Cal.App.3d at p. 700.)

In the instant case, the shoe is on the other foot on appeal. Here, the trial judge who heard all of the evidence and presumably was in the best position to evaluate defendants' $100,000 offer to Santantonio concluded that it was reasonable. The court's ruling expressly states: "The amount of the offer was also reasonable based on the substantial evidence of poor performance documented by defendants." Indeed, it is significant that in this case, Santantonio's failure to obtain a judgment more favorable than the defendants' offer did not result from fortuitous offsets like those in *Elrod*. Rather, it was the result of a complete defense verdict against him on the issue of liability. For that reason alone, the offer must be regarded as prima facie reasonable.

 b. *The trial court did not abuse its discretion in concluding that defendants' offer was reasonable.*

We find no merit to Santantonio's arguments as to why defendants' $100,000 offer was not a realistic one at the time it was made. Santantonio's

brief states: "To Mr. Santantonio, the Defendants made an entirely unreasonable offer [because they offered him] less than one-ninth of his projected economic losses." But the mere fact that Santantonio claimed projected economic losses of over $900,000 does not mean that defendants' $100,000 offer was unreasonable or unrealistic. Defendants contended that they had no liability to Santantonio at all, and the jury ultimately agreed. Moreover, defendants contended that the damage estimates by plaintiffs' expert were greatly excessive, especially in Santantonio's case.

Defendants' expert economist, Michael Ward, testified that he estimated Santantonio's past economic losses to be between $120,624 and $198,959, depending upon whether it took Santantonio one year or two years to obtain another job in radio or television sales. Based on his survey of available jobs in the industry, Dr. Ward testified that there was no good reason why Santantonio should not have been able to get another sales job within one to two years after being terminated by KFWB.

Dr. Ward further testified that he estimated Santantonio's projected future economic losses to be no more than another $79,674 to $87,273. Dr. Ward explained that the projected future losses were attributable to Santantonio's loss of pension benefits at KFWB and the slight differential in pay he might have on another job based on the average salary for account executives in the industry, projected out to the time of his expected retirement under Department of Labor tables. Thus, Dr. Ward's highest estimate of the combined past and projected future economic losses for Santantonio amounted to $286,232. Defendants offered to settle for approximately 35 percent of that, even though they strongly believed (as the jury found) that they had no liability at all.

Santantonio also seeks to justify his rejection of the $100,000 settlement offer because defendants offered the same amount to Cochrane, even though Cochrane's claimed economic losses were only one-third as much as Santantonio's, and Cochrane then recovered more than four times the offer. Santantonio argues: "There could be any of a hundred reasons why the jury did not find for Mr. Santantonio, none of which have anything to do with the value of his claim." Any evaluation of Santantonio's claim, however, would prudently take into account the possible reasons why a jury might find defendants were not liable for any claimed age discrimination against him. A complete transcript of the record has not been provided to this appellate court, but a reasonable inference is that there were indeed very good reasons why the jury found against him and Velona, but in favor of Cochrane. Poor performance on the part of Santantonio and Velona is evident from Judge Leahy's statement that "the substantial evidence of poor performance documented by defendants" supported his ruling that defendants' $100,000 offer to Santantonio was reasonable.

### c. *Santantonio's claim that defendants attempted to trick plaintiffs with their section 998 offer is nonmeritorious.*

■ Santantonio maintains defendants attempted to "trick Plaintiffs by their 998 Offer," and he was unaware when he rejected it that defendants would use it as a "ploy" to "shift the bulk of their litigation costs" to him. He says he would have considered the offer differently if he had thought rejection would expose him to such exorbitant amounts for defendants' expert fees.

Santantonio overlooks the fact that section 998 expressly allows a party to shift part of his or her litigation costs to the other side when the statutory conditions are met; and those costs may, in the court's discretion, include expert fees. Experienced litigation counsel know that expert fees can be very substantial, depending on the nature of issues litigated. We assume Santantonio's trial counsel competently explained this exposure to him at the time defendants' section 998 offer was evaluated and rejected. Santantonio's complaints about the nature and amount of the expert fees ultimately allowed by the trial court are not relevant to the issue of whether the section 998 offer was valid. Those complaints go only to the separate question, which we discuss later, of whether the court below abused its discretion in determining what should properly be allowed under section 998, given the fact that Santantonio did not obtain a more favorable judgment than what was offered to him.

Santantonio mistakenly relies on *Elrod* in support of his argument that he should now be relieved of the statutory consequences of his rejection of defendants' section 998 offer because he misjudged how much exposure he might have for defendants' costs. The argument is out of context. The *Elrod* court's discussion about viewing the reasonableness of an offer in the light of what the offeree knows or does not know at the time the offer is made has reference to facts bearing on the evaluation of the offeree's own claim. The discussion did not involve an evaluation of what the cost exposure might be if the offer were to be rejected. This is made clear when the language quoted in Santantonio's brief is placed back in proper context:

"If the offer is found reasonable by the first test, it must then satisfy a second test: whether defendant's information was known or reasonably should have been known to plaintiff. This second test is necessary because the section 998 mechanism works only where the offeree has reason to know the offer is a reasonable one. If the offeree has no reason to know the offer is reasonable, then the offeree cannot be expected to accept the offer.

"Thus, suppose defendant's files contain 'dynamite' information likely to insulate it from liability. However, the information is subject to a privilege

and is not discoverable by plaintiff. Defendant intends to waive the privilege and use the information at trial. Defendant makes a low offer premised on its exclusive knowledge; an objective appraisal of other circumstances, including defendant's likely liability for damages, would indicate the offer is patently unreasonable. Unless defendant communicates its exclusive knowledge to plaintiff with its offer, the offer is not reasonable and does not qualify as a valid section 998 offer. Since defendant knew or reasonably should have known plaintiff lacked information necessary to evaluate the offer, defendant did not make the offer in good faith for purposes of section 998.

"*However, we emphasize the reasonableness of defendant's offer does not depend on information actually known to plaintiff but rather on information that was known or reasonably should have been known.* The latter standard is an objective one: would a reasonable person have discovered the information? A contrary conclusion would make defendant's good faith incongruously depend on plaintiff's subjective knowledge and would reward plaintiffs who are dilatory in pursuing discovery. *Thus, if a defendant makes a low offer shortly before trial based upon potent evidence likely to insulate defendant from liability, and if the evidence was reasonably available to plaintiff, defendant's offer may qualify as a valid section 998 offer even though plaintiff did not in fact know of the information because he failed to investigate or pursue discovery.*" (*Elrod* v. *Oregon Cummins Diesel, Inc.*, *supra*, 195 Cal.App.3d at pp. 699-700, italics added.)

There is nothing in the record to suggest that the facts which defendants believed would prove that they had not terminated Santantonio because of his age were not as well known to him as they were to defendants. But Santantonio consciously disputed defendants' reasons by taking the matter to trial, thereby making it necessary for defendants to engage experts to help prove their case. Under section 998, defendants are entitled to recover a share of those costs from Santantonio, and nothing in *Elrod* provides him with a legitimate excuse for failing to properly evaluate his statutory exposure.

B. *The Trial Court Did Not Abuse Its Discretion in Determining What Costs Should Be Allowed.*

Santantonio repeatedly asserts that the trial court improperly allowed the expert fees as a recoverable cost under section 998, because (a) they were not actual expert fees; (b) they were not reasonably necessary in the defense of defendants' case; and (c) they were not sufficiently described in defendants' cost memorandum.

Santantonio does not dispute that the trial court's determination on these issues can be reversed only for an abuse of discretion. The governing rule is set forth in *Evers* v. *Cornelson, supra,* 163 Cal.App.3d 310, 314-315, as follows:

"Defendant complains that certain items of costs awarded by the trial court were exorbitant and, therefore, unreasonable and the only evidence presented to support these costs was the hearsay declarations of plaintiff's counsel. On the issue of whether the costs were exorbitant and unreasonable, the courts have consistently held that where a trial court has been vested with discretion to perform an act, and it so acts, its actions can only be set aside for an abuse of discretion. [Citations.] **(9)** As this court stated in *Huber, Hunt & Nichols, Inc.* v. *Moore* (1977) 67 Cal.App.3d 278, 315 . . . : 'The trial court has discretion under Code of Civil Procedure section 998 to allow a prevailing party (as defined in the section) a reasonable sum to cover the costs of the services of expert witnesses. [Citation.] *The trial court was in a far better position, having heard the entire case and observed the demeanor of witnesses, to exercise this discretion and determine what was a reasonable amount and what was reasonably necessary.'* As in the *Moore* case, we should not substitute our judgment over the judgment of the trial court in the absence of a clear showing of an abuse of discretion. Here, there has been no such showing on the issues of what was a reasonable amount and what was reasonably necessary.

 "As to defendant's attack on plaintiff's proof of her costs, generally, '[i]f items on their face appear to be proper charges, the verified memorandum of costs is *prima facie* evidence of their propriety, placing the burden of proof on the party attacking them.' " (Italics added.)

To the same effect, see *Balfour, Guthrie & Co.* v. *Gourmet Farms* (1980) 108 Cal.App.3d 181, 192 [166 Cal.Rptr. 422] and *Stiles* v. *Estate of Ryan* (1985) 173 Cal.App.3d 1057, 1066 [219 Cal.Rptr. 647].)

 Here, the trial judge was justified in concluding that the amounts awarded as expert fees were in fact for expert services and that those services were reasonably necessary to defendants' case. Santantonio's arguments to the contrary appear to rest primarily on references to a few selected items described in the bills of Welch Associates. However, the most reliable evidence of what services were performed is the actual trial testimony of Finis Welch and Michael Ward, which Santantonio largely ignores.

The record reflects that Dr. Welch, the founder of Welch Associates, is an economist specializing in statistics and labor economics. His testimony

focused on various issues concerning the liability side of plaintiffs' claims of age discrimination. Defendants contended that Santantonio and Velona were terminated and that Cochrane had been threatened with possible termination because they all failed to meet certain specific performance goals for account executives set by KFWB's management. In particular, beginning in 1987, KFWB required each account executive to meet a specific annual budget for new business production as a condition of continued employment.

Although we are not provided with a complete reporter's transcript of the trial it is undisputed in the briefs on appeal that throughout the trial plaintiffs made numerous charges to the effect that their alleged poor performance was a subterfuge for age discrimination. Some of their claims included the following: that there was no business justification for management's decision to require account executives to meet specific goals for new business production to keep their jobs; that the new business budgets established for plaintiffs were more burdensome than those set for other account executives; that management engaged in numerous acts to favor other account executives and make it impossible for plaintiffs to achieve their new business budgets; and that management even skewed the records to make it appear that plaintiffs performed poorly in comparison with other account executives, when plaintiffs actually were performing better than others who were not terminated or threatened with termination.

Dr. Welch was engaged by defendants to examine all of these contentions and to express his opinions concerning them as an economist. His testimony was supported by some 34 exhibits, consisting of charts and graphs prepared under his direction. As a sampling, he testified that there was a legitimate business need for KFWB's rigorous insistence upon the production of new business as a condition for retaining one's job as an account executive; there was no pattern of age discrimination in the setting of new business budgets for plaintiffs and other account executives, and plaintiffs' budgets were not more burdensome than others; plaintiffs, including Santantonio, performed poorly in relation to the goals set for them; at the time he was discharged on April 13, 1989, Santantonio ranked last in new business production and he had been below his budget and on a steady decline since August of 1987; and there was no disparate treatment of plaintiffs, nor any pattern of age discrimination in how management dealt with other account executives who failed to meet their performance goals.

Dr. Ward also was an economist and was employed by Welch Associates. He was engaged primarily to estimate the amount of economic loss that might have been suffered by plaintiffs by reason of their leaving KFWB. His testimony was needed to counter the testimony of plaintiffs' own damages

expert, Dr. Joyce Pickersgill, and the testimony of Santantonio and Velona as to why they could not get comparable employment to mitigate their claimed damages. Dr. Ward's preparation included conducting a survey of available jobs for experienced salespeople in radio and television in Los Angeles and the average salary paid for such available jobs.

From the foregoing summary of testimony by Drs. Welch and Ward, we conclude that the trial court did not abuse its discretion in determining that the services of Drs. Welch and Ward were expert witness services and that those services were reasonably necessary for presentation of defendants' case. Santantonio's argument that some of the preparation, and some of the testimony, could have been provided through defendants' own staff, is not compelling. We conclude that it was reasonable for defendants to have Drs. Welch and Ward independently develop and analyze the evidence relied upon for their expert opinions with the aid of their own staff economists and other support personnel and then present such evidence through their trial testimony and the illustrative exhibits prepared under their direction.[5]

Lastly, Santantonio argues without merit that costs allowed under section 998 must be limited to the actual time consumed in examination in court. The reference to Government Code section 68092.5 in section 998, subdivision (h) is interpreted to mean that any fees charged for trial time must not exceed the expert's normal rate. Costs recoverable under section 998, subdivision (c) expressly include "a reasonable sum to cover costs of the services of expert witnesses, . . . reasonably necessary in *either, or both, the preparation or trial* of the case by the defendant." (Italics added.)

In *Evers* v. *Cornelson, supra,* 163 Cal.App.3d 310, 317, the court expressly held that section 998 does indeed cover trial preparation by an expert.

"It appears reasonable to expect an expert witness who is going to testify at trial to prepare to be able to assist the jury on difficult issues. The more prepared the expert witness is, the more help he will be. The question is really whether the amount of time spent by [the expert] in preparing for trial was reasonable. The trial court found that this preparation was reasonably necessary and that the total cost was a reasonable amount. Again, absent a showing by defendant of an abuse of discretion, the trial court's findings will not be disturbed on appeal. [Citations.]" (163 Cal.App.3d at p. 317.)

---

[5]We find unpersuasive Santantonio's contention that he should not have to pay $3,345.76, or one-third of the cost of the experts' exhibits, because they were "merely illustrative and of little value." The trial judge was in the best position to judge their value. The costs are recoverable under *Balfour, Guthrie & Co.* v. *Gourmet Farms, supra,* 108 Cal.App.3d 181, 192.

The court in *Evers* went on to further hold that section 998 also covers the cost of experts who aid in the preparation of the case for trial, even if they do not actually testify. (163 Cal.App.3d at p. 317.) The court observed: "Since the statute does not specify precisely the services for which costs are recoverable, the determination of allowable costs is largely within the trial court's discretion." (*Id.*, at pp. 317-318.)

Based on these principles, we conclude that the trial judge acted within his discretion when he allowed not only the amounts charged by Drs. Welch and Ward for their own preparation and trial time, but also a portion of their separately itemized charges for staff economists and other skilled employees who helped them in that preparation.

## C. *The Court's Allocation of One-third of the Total Costs to Appellant Was Not Excessive.*

Santantonio contends he should not have to bear one-third of the costs simply because there were three plaintiffs. He concedes that the allocation of defendants' costs among the plaintiffs was a matter for the trial court's discretion, but he argues that the court abused its discretion.[6]

Santantonio makes the following statement in his brief in support of his argument that the trial court abused its discretion: "Substantial evidence supports a far different conclusion; that Defendants did not believe that Mr. Santantonio would prevail, and instead concentrated their efforts on defending against the other Plaintiffs, especially Mr. Cochrane." The statement is devoid of any reference to the record before this court. As noted previously, we have not been presented with a complete reporter's transcript on appeal. We assume that if the record supports the argument then Santantonio surely would have perfected the relevant portion of the record on appeal. But we are presented with a record which demonstrates what the defendants said on the subject by examining their memorandum of costs filed in the trial court. The memorandum contains the following: "The $100,000 offer made to each of the three plaintiffs in this case was entirely reasonable and proper under the circumstances. The offer was consistent with offers made to the plaintiffs in mandatory settlement conferences before the court, and with the defendants' realistic exposure in terms of economic losses to each of the three

---

[6]We note the inconsistency of the argument with the position taken by his trial counsel in plaintiffs' motion to tax costs. When trial counsel filed his moving papers concluding that defendants were seeking to recover two-thirds of their recoverable costs from Santantonio, he argued that Santantonio should only have to bear 50 percent of any costs awarded under section 998 and one-third of any costs awarded under section 1033.5. In fact, however, defendants' memorandum in opposition to plaintiffs' motion to tax costs asked that only one-third of all of the claimed costs be awarded against Santantonio.

plaintiffs. In this regard, although plaintiff Santantonio alleges that his economist projected economic losses in excess of $900,000, the projection did not take into account either Santantonio's nonexistent efforts to mitigate his damages or his alleged stellar reputation in the industry which would presumably have enabled him to find other work in the broadcasting field had he attempted to do so. Defendants' offer also took into account the common overriding defense to the action based on all the plaintiffs' subpar work performance, in addition to the relatively small possibility of an award of emotional distress or punitive damages to any of them. The $100,000 offer to each of the plaintiffs was therefore justified, particularly in view of the strength of the company's defenses and the similarity of the fact patterns to all three cases."

Thus, from what we can discern from the record provided to this court and contrary to Santantonio's argument, the fact that defendants considered their $100,000 offer to be reasonable in part because they believed his $900,000 claim of economic loss was overstated, does not logically compel the conclusion that they concentrated their efforts on defending against the claims of the other two plaintiffs. The record is clear that the defendants placed exactly the same $100,000 value on the claims of Velona and Cochrane.

Lastly, Santantonio argues that it is a matter of simple arithmetic that he should have the lowest pro rata portion of defendants' recoverable costs, because he was offered the lowest percentage of his claimed economic losses. The argument presents an obvious non sequitur when we review the record and find that the $100,000 offered to each plaintiff represented a smaller percentage of Santantonio's claim than that of the claims of the other two plaintiffs since Santantonio's claimed economic losses were the greatest. The record is highly suggestive that, if anything, Santantonio had the largest claim and that he would be the focus of intense defense efforts, since defendants had more to lose if he prevailed.

To reiterate, the trial judge was in the best position to allocate a fair share of the recoverable costs to Santantonio. The court concluded that one-third of the total costs ultimately found to be allowable (after various reductions) was a reasonable allocation. Santantonio has not demonstrated that the allocation by the trial judge was an abuse of discretion.[7]

---

[7]In reading the dissent, part II gives us considerable concern. Section 998 already permits the trial court, via exercise of discretion, to consider a party's ability to pay costs. No matter how well intended, to judicially graft such a requirement on the statute itself, goes beyond mere statutory interpretation and improperly invades the province of the Legislature.

## V.

### DISPOSITION

The judgment is affirmed. Costs of appeal are awarded to respondents.

Lillie, P. J., concurred.

**JOHNSON, J.,** Dissenting.—I respectfully dissent for two reasons. First, in my view the trial court erred in shifting any costs since the Code of Civil Procedure section 998[1] offer was not unconditional as required by that statute. Second, assuming it were appropriate to shift some costs, the court erred in failing to take account of appellant's means in setting the amount of the award.

I. *The Offer Was a Joint Offer Conditional on Acceptance by All Plaintiffs and Thus Invalid Under Section 998.*

In my view the section 998 offer in this case was conditional and its rejection therefore cannot serve to shift the costs of defendant's expert witnesses to appellant. The offer was conditional because it required acceptance by all three plaintiffs. As such, it is not effective to shift costs under *Hutchins* v. *Waters* (1975) 51 Cal.App.3d 69, 73 [123 Cal.Rptr. 819] and *Meissner* v. *Paulson* (1989) 212 Cal.App.3d 785, 791 [260 Cal.Rptr. 826].

My first problem is with the fact respondent did not serve a separate section 998 offer on each of the three plaintiffs. Instead it combined the three offers in a single joint document and served it on the attorney who happened to be representing all plaintiffs.

*Hutchins* dictates before a party can claim the benefits of cost shifting, it must be shown that party "served an unconditional offer in writing upon any other party to the action, or to *each* of several other parties to the actions." In my view, this language clearly requires that in multiplaintiff litigation the defendant must serve a separate offer on each individual plaintiff, even if all plaintiffs happen to be represented by the same attorney. Not only is this requirement compelled by the language of the statute, but it serves important policies. This rule is the only way to ensure each offer is individual to a given plaintiff and can be accepted by that plaintiff even if the others reject their offers. Furthermore, it is the best way of avoiding any ambiguity whether each of these offers is unconditional and not dependent upon acceptance by all parties. Indeed the instant case is a good example of what happens when the offer is a combined offer to several parties.

---

[1]All statutory references are to the Code of Civil Procedure unless otherwise indicated.

A still more fundamental objection, however, is the nature of the offer embodied in this single document. At many critical places, the offer is written in the plural and the conjunctive. Indeed it is not only a tenable but a most reasonable inference the document sets forth a joint offer to all three plaintiffs and that all three plaintiffs had to accept the offer. The only instance where the offer does not speak in the plural is where it apportions the total amount among the plaintiffs, setting it at $100,000 to each plaintiff.

When read in context the offer to compromise looks clearly conditional. For example, in its most critical passages, the document states defendants "hereby *offer* that *plaintiffs . . . take judgment* against *them* in the following amounts" and "*plaintiffs may file a proof of acceptance.*" The proper inference is the offer must be accepted by all three plaintiffs. This inference is reinforced by other portions of the document. The first reference to the plaintiffs is to all three, Mr. Velona, Mr. Cochrane and Mr. Santantonio. The numbered paragraphs apportioning the section 998 offer at $100,000 each are also stated in the conjunctive. The only other reference to the plaintiffs or to any of them is collective, stating the "Plaintiffs" [plural] "may file a proof of acceptance" [singular]. The plaintiffs had to act together to accept the section 998 offer, rendering it conditional and, therefore, invalid for purposes of assessing costs against any of the plaintiffs under *Hutchins*.

The majority is prepared to dismiss this entire argument because ". . . the record on appeal does not reveal that this issue was raised in the trial court." (Maj. opn., *ante*, at p. 113.) However, the interpretation of an integrated instrument or writing is a question of law, as is the interpretation of a statute. (9 Witkin, Cal. Procedure, Appeal § 242 (3d ed., 1985); *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Estate of Butler* (1988) 205 Cal.App.3d 311, 317 [252 Cal.Rptr. 210].) Accordingly, whether the section 998 offer was valid on its face may be reviewed de novo in this court. Extrinsic evidence would have been irrelevant if tendered in the trial court. Consequently, any failure to raise this particular issue below does not deprive this court of any information required to properly interpret the document presenting this section 998 offer.

II. *This Award and Like Section 998 Awards Threaten to Distort Litigation Incentives and Behavior Unless Scaled in Size to the Comparative Economic Resources of the Competing Litigants.*

Even if I agreed it was appropriate to shift some costs to appellant pursuant to section 998, I would reverse and remand for reappraisal of the amount of the costs which properly could be shifted. In my view, the trial

court erred in failing to assess appellant's economic resources and to include that factor in its calculation of the cost award. Unless trial courts include this factor in setting the costs to be shifted under section 998, they will distort settlement incentives and unduly discourage individual litigants from pursuing reasonable courses of action in the courts.

There is no doubt cost shifting performs a major purpose in the section 998 process. It gives the party receiving the offer an added incentive to behave reasonably. Reasonable behavior means accepting a reasonably generous offer. But it also means rejecting an unreasonably stingy one. To encourage reasonable behavior, therefore, the amount of the costs which may shift also must be reasonable. Not just reasonable in absolute terms, but reasonable in comparison with the resources of the offeree. If modest income litigants are required to risk the imposition of $100,000 in costs if they reject a section 998 offer, they will feel compelled to accept *any* such offer, even if it is far below what they have a reasonable prospect of winning at trial. Particularly if the opposing party is a large institution, as it was here, the average person can't afford to gamble. It is like going to a casino and entering a no limit game against the "house" with only one week's paycheck in the bank.[2]

---

[2]In *Covenant Mutual Ins. Co.* v. *Young* (1986) 179 Cal.App.3d 318, 326-328 [225 Cal.Rptr. 861], this court discussed some of these economic incentives in a different context, a one way fee-shifting statute. The basic principles, however, remain the same. The average individual considering litigation or involved in litigation is "risk aversive," indeed cannot afford to be anything else. Institutional litigants and other "repeat players," on the other hand, can afford to be "risk neutral" and indeed against individuals often can adopt a "risk preference" strategy. This means the average individual, when confronted with a litigation choice which carries a risk that costs will be shifted should that individual lose, will accept an unreasonably unfavorable offer in order to avoid that risk.

Even if the "expected value" (damages sought multiplied by probability of obtaining those damages) of a case is $200,000 or more individual litigants might well feel compelled to accept an offer of $100,000 or less just because they are risk averse and unwilling and unable to accept the risk of having to pay $100,000 in expert witness fees to the other side if they lose. Indeed for many individuals of modest means the risk they might be required to pay the other side $100,000 in costs should they lose will dissuade them from filing a case in the first place. As one economic analyst observed, "given risk aversion and the diminishing marginal utility of income and wealth, the threat of having to pay the other side's fees can loom so large in the mind of a person without considerable disposable assets that it deters the pursuit of even a fairly promising and substantial claim or defense." (Rowe, *Predicting the Effects of Attorney Fee Shifting* (1984) 47 Law & Contemp. Probs. 139, 153.)

Even if they do embark on the litigation modest income litigants may well feel compelled to drop the case when that cost-shifting possibility appears during the course of the proceedings. Lacking the resources to absorb this kind of financial burden, they would feel compelled to accept a nominal sum, or nothing. It is as if in the final hand of a poker game with everything in the pot the "house" suddenly raises the ante to an amount most players can't afford. No one would regard that as fair. In the world of litigation, it is not only unfair. It leads to unjust and economically unjustified settlements.

The courts have recognized the need to adjust cost assessments to the parties' means in other contexts. For example, this court in *In re Marriage of Norton* (1988) 206 Cal.App.3d 53 [253 Cal.Rptr. 354], held family courts are required to determine the parties' comparative financial resources before shifting legal fees from one to the other, even when the reason for the shift is to encourage the parties to behave reasonably during the litigation. In *Norton*, the trial court found the wife had behaved unreasonably during settlement negotiations with her husband and in other proceedings before the court. A then newly enacted provision, Civil Code section 4370.5, authorized family court judges to require spouses who had behaved unreasonably to pay the legal fees their spouses incurred as a result. Using this law, the court shifted a part of the husband's legal fees to the wife, but only after being careful to determine the parties were of equal means.

This court affirmed the shift of legal fees from the husband to the wife. But we took care to emphasize we would have reversed if the trial judge had not ascertained the wife's economic situation before placing this burden on her. We held this was a requirement, despite the fact Civil Code section 4370.5 at that time failed to mention anything about the respective needs or financial resources of the competing litigants.[3] As we explained:

"The purpose of Civil Code section 4370.5 is to encourage reasonable litigation and settlement behavior in marriage dissolution proceedings. The purpose is not to cause undue hardship nor to discourage parties from pursuing meritorious actions. Therefore, the other party may not be entitled to an award of all fees and costs he or she expended in the proceedings."

"Less affluent parties, typically wives, may be unduly discouraged from vigorously prosecuting legitimate claims and defenses if they face the prospect of having to pay substantial cost and fee awards to the other side. This problem will be compounded if there is a gross disparity of resources. The other side will not feel the same inhibitions since this wealthier party will not find it nearly so hard to pay any award the court may impose for its litigation behavior. This creates an imbalance in the incentives to behave appropriately during settlement negotiations and litigation. Economic analysis suggests the less affluent party will behave too timidly during litigation and accept unfavorable settlement terms when facing a party who is less concerned about the possible economic disincentives of taking a hard line. (See *Covenant Mutual Ins. Co.* v. *Young* (1986) 179 Cal.App.3d 318, 325-327. . . , and authorities cited therein.)" (*In re Marriage of Norton, supra,* 206 Cal.App.3d 53, 59-60.)

---

[3]Subsequent to our decision in *Norton*, the Legislature amended Civil Code section 4370.5 to include express language requiring courts to ascertain the parties' respective means before setting the direction and amount of any fee shifting under that code section.

In a pair of recent decisions, appellate courts also have recognized trial courts must take account of a party's economic status before imposing other litigation costs on them. Both of these cases arose when trial courts ordered discovery matters to be heard by "private judges" pursuant to sections 639 and 645.1. As is typical in such "references," the court ordered the parties to divide the private judge's fees for performing this task.

In the first case, *Solorzano* v. *Superior Court* (1993) 18 Cal.App.4th 603 [22 Cal.Rptr.2d 401], one of the parties was indigent. The appellate court reversed the order, holding the indigent party could not be compelled to pay these fees because of the state's in forma pauperis provisions. The second case, *McDonald* v. *Superior Court* (1994) 22 Cal.App.4th 364 [27 Cal.Rptr.2d 310], involved a person of modest means rather than an indigent. In an opinion which resonates in this case, the court emphasized cost assessments cannot be used to discourage middle class citizens from having effective resort to the courts either.

"As stated in *Solorzano* in discussing in forma pauperis plaintiffs: 'Fees of $200 to $300 per hour charged by privately compensated discovery referees allow affluent litigants to avoid discovery compliance by pricing enforcement of legitimate discovery demands beyond the means of indigent plaintiffs. This *advantage based on wealth* flows directly from the trial court's order imposing equal division of fees between indigent plaintiffs and an adverse litigant of far superior financial means.' [Citation.] The same policy considerations apply where one party has financial resources far superior to an opposing party who, while not proceeding in forma pauperis, has clearly limited financial means." (*McDonald* v. *Superior Court, supra*, 22 Cal.App.4th 364, 369, italics added.)

Just as trial courts must avoid imposing unreasonable discovery costs on modest income litigants they must avoid shifting other types of unreasonable litigation costs to those same litigants if the litigation process is to be fair and to produce just results.[4] In order to properly balance litigation incentives to produce fair and reasonable settlements under section 998, the amount of the fees shifted must be *scaled* to be proportionate to the comparative financial resources of the competing parties. The prospect of a $100,000 cost shift may represent a reasonable incentive to accept a section 998 settlement offer if the offeree has ample resources. For persons of only modest means,

[4]Notably, the *McDonald* court held it was unfair to impose costs of a few hundred or at most a few thousand dollars on modest income litigants. In the instant case, we are considering the effect of imposing $100,000 or more in costs on this same class of litigants. Obviously, the concerns which led the *McDonald* court to prohibit discovery references when modest income litigants are involved, apply with much greater force to massive cost shifting awards granted pursuant to section 998.

however, that $100,000 will loom as a terrifying threat, one calculated to distort their decisionmaking and force them to cave in to unreasonably low section 998 offers.[5] Since the trial court made no inquiry into appellant's financial status, we do not know for sure whether $100,000 was a reasonable disincentive for someone like appellant or whether the amount of this cost shift must be scaled back in order to avoid irrational and unfair results in this and future litigation. (On the other hand, we do know one of the other three plaintiffs in this case had to declare bankruptcy, presumably in whole or in part because of the threatened assessment of the $100,000 in costs.)

Civil Code section 4370.5 construed in *Norton* and sections 639 and 645.1 construed in *Solorzano* and *McDonald* expressly allow the trial court discretion in imposing fees, costs, or other expenses on litigants. In both instances, appellate courts have held trial courts abuse this discretion if they fail to take account of the adverse impact substantial cost shifts visit on the average citizen who is trying to use the courts. Similarly, section 998 confers discretion on trial courts in deciding whether and how much of expert witness fees and preoffer costs an unsuccessful litigant must pay. That section provides: "[T]he court, in its discretion, *may* require the plaintiff to pay the defendant's costs from the date of filing of the complaint and a *reasonable* sum to cover costs of the services of expert witnesses, . . . actually incurred and reasonably necessary in either, or both, the preparation or trial of the case . . . ." (§ 998, subd. (c), italics added.)

The bulk of the costs the trial court shifted to appellant in this case consisted of expert witness fees.[6] Under the terms of section 998, the trial court had discretion to refuse to shift these fees at all. Moreover, since the

---

[5]There is empirical support for this proposition in a study of the English version of California's section 998 procedure, which in that country is called the "payment into court" system. As is true under section 998, a plaintiff must obtain a judgment more favorable than the defendant's statutory offer or suffer the consequence. In England, however, that means paying the defendant's reasonable legal fees as well as costs. The study revealed that out of a sample of 664 personal injury cases studied in four cities, 41 percent involved a payment into court. In fully 90 percent of those cases the plaintiff accepted the "payment in" money the defendant tendered. In virtually all the remaining 10 percent, however, the cases where plaintiffs had the courage to refuse the "payment in" and went to trial, they received damages larger than the amount paid in. This led the author of the study to conclude many of those who had accepted the "payment in" also would have won more at trial than the figure they settled for, but decided against trial because they could not afford to risk the possibility of having to pay the defendant's fees and costs. (Zander, *Costs of Litigation—A Study of the Queen's Bench Division* (June 25, 1975) Law Society's Gazette 680; Zander, *Is the English Payment-Into-Court Rule Worth Copying?* (1976) 40 Rabels Zeitschrift 750.) This study is discussed in Cappelletti and Garth (edit.), Access to Justice: Emerging Issues and Perspectives (1979) pp. 44-46, 54-56.)

[6]Since I consider the two alternative grounds argued in this dissent more than sufficient to justify reversal of this cost award, I do not discuss yet a further reason for reducing the expert

amount shifted for this purpose is to be "a reasonable sum" the trial court also had discretion to reduce this element of the cost award to a sum below what respondents reasonably paid for expert witness services. Construing comparable laws, *Norton, Solorzano,* and *McDonald* held it was proper, indeed essential, that trial courts in exercising their discretion determine how the proposed cost shifting would affect the litigant who would be paying those costs not just whether the costs were otherwise reasonable in amount.

What this court said in 1986 about Civil Code section 4370.5 applies with equal force to section 998. "Nothing in the language of section 4370.5 [nor of section 998] suggests it is designed to encourage unfair settlements or inappropriately timid litigation behavior. Indeed it is entirely consistent with [either of these code sections] for trial courts to take account of the comparative wealth of the competing litigants and the effect of wealth disparities on litigation behavior when they fashion any fee and cost awards they may impose pursuant to [these sections]. What is a reasonable award for one party . . . may be unreasonable if imposed on the other. For, unless trial courts 'scale' any such awards to the comparative wealth of the parties they may discourage the economically weaker party from filing actions she or he should and from pursuing those actions with the vigor they deserve." (*In re Marriage of Norton, supra,* 206 Cal.App.3d 53, 60.)[7]

Since section 998 so clearly allows trial courts discretion to take account of these considerations implicating fairness and litigation behavior when deciding cost shifting awards, I find it unnecessary to discuss a statute not now before us, one which *mandated* substantial cost shifting against unsuccessful litigants. Suffice it to say, in my view such a law would raise grave constitutional issues. For reasons discussed above and at greater length in *Covenant Mutual, supra,* and *Norton, supra,* there is great danger such a

---

witness component of the award. A substantial percentage of that award represents payments to nonexperts who compiled and analyzed data respondents' experts used in preparing and giving their testimony. It is not at all clear to me these payments to nonexperts fall within the statutory definition of "costs of the *services* of expert witnesses" entitled to recompense under section 998.

[7]In footnote 7 of the majority opinion, it is conceded the trial court had discretion "to consider a party's ability to pay costs." This footnote, however, then suggests it somehow is beyond the role of the appellate judiciary to require trial courts to consider this factor when exercising their discretion to set the amount of cost awards under section 998. If so, this court exceeded its role in *Norton* as did the courts which decided *Solorzano* and *McDonald*. As discussed above, in all three of these cases the appellate courts imposed a requirement trial courts consider this factor when exercising their discretion, even though it was not explicitly mentioned in the statutes at issue in those cases. I suspect there are literally thousands of appellate opinions, some of them written by my Division Seven colleagues, spelling out factors which trial courts are expected to consider when exercising their discretion under various statutes, even though those factors are not mentioned explicitly in the statutes themselves. Indeed this is one of the primary functions of the appellate courts.

provision would deny the average citizen the access to the courts which due process and equal protection of the laws guarantee. It would make California's regular civil courts the exclusive province of litigants with the resources to play a high stakes game of litigation poker.

There is another reason we should be especially careful to ensure cost shifting under section 998 is not permitted in amounts which might discourage plaintiffs from filing and vigorously pursuing litigation of the type involved in this case. Appellant and his fellow plaintiffs brought this case under civil rights statutes designed to enforce government policies against age discrimination. Allowing section 998 cost shifting in amounts which distort settlement incentives is counterproductive to the governmental purpose of encouraging what typically are modest income individuals to pursue private relief under these laws. By sanctioning such cost shifting, courts discourage those same modest income individuals from seeking relief and thereby from enforcing those important public policies against discrimination.

To sum up, I would reverse this cost shifting award outright based on the fact it was the product of a conditional section 998 offer which required or appeared to require the acquiescence of all three plaintiffs. But assuming the section 998 offer were proper, I would reverse and remand for a determination whether the amount of that award was proper. I would instruct the trial court to reconsider that question in light of its impact on litigation between average Californians of modest income and economically powerful institutions or individuals.