Filed 4/28/16  Ammari v. Union Pacific Railroad Co. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ASEF F. AMMARI et al., | |
| Plaintiffs and Appellants, | G052290 |
| v. | (Super. Ct. No. RIC512012) |
| UNION PACIFIC RAILROAD COMPANY, | O P I N I O N |
| Defendant and Appellant; | |
| GLEN LEE HOLMES, | |
| Defendant and Respondent. | |

Appeals from a judgment and orders of the Superior Court of Riverside County, John W. Vineyard, Judge.  Request for judicial notice.  Judgment affirmed.  Orders affirmed.  Request for judicial notice denied.

Makarem & Associates, Ronald W. Makarem, Jen-Paul Le Clercq; Law Office of Mann & Elias and Imad Y. Elias for Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, Anthony E. Sonnett and Trevor J. Ingold for Defendant and Appellant Union Pacific Railroad Company and Defendant and Respondent Glen Lee Holmes.

This case arises out of a fatal collision between a freight train operated by defendants Union Pacific Railroad Company (Union Pacific) and its conductor Glen Lee Holmes (Holmes) and a sport utility vehicle (SUV) driven onto the railroad tracks by decedents Renee Ammari and Tanya Sayegh shortly before the accident. The SUV became stuck and decedents died as a result of injuries sustained when the train struck the SUV. Their parents and successors in interests, plaintiffs Asef F. Ammari, Jackleen Ammari, and Samia Sayegh, sued defendants for negligence.

Following the close of evidence, the trial court instructed the jury on the definition of the word "negligence" as follows: "Negligence is the failure to use reasonable care to prevent harm to oneself or to others. A person can be negligent by acting or failing to act. A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation." The jury returned a special verdict answering, "No" to the question "Was Defendant Union Pacific Railroad Company negligent?" Because the answer was "No," the jury was not required to and did not answer the question of whether such "negligence [was] a substantial factor in causing harm to [decedents]" or whether decedents' negligence was a substantial factor in causing them harm.

Plaintiffs contend the court abused its discretion in denying their motion for new trial because the evidence supports a verdict in their favor. We disagree. Plaintiffs also contest the order denying their motion for judgment notwithstanding the verdict. But the challenge has been forfeited because that was separately appealable order that plaintiffs did not designate in their notice of appeal. (Code Civ. Proc., § 904.1, subd. (a)(4) (all further undesignated statutory references are to this code); *In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 761, fn. 8 [if order is appealable, an appeal must be taken or the right to appellate review is forfeited].)

2

Plaintiffs request that we take judicial notice of "[a] demonstrative Power Point presentation" used by their expert during trial and "[a] demonstrative video recording of 'Track Image Recorded Video.'" We deny the request as the items are unnecessary to the determination of this appeal. We decide only whether time was substantial evidence to support the trial court's determination; if there is, the quantum of contrary evidence is irrelevant.

Union Pacific cross-appeals from the court's orders granting plaintiffs' motion to tax expert witness costs and denying its motion for attorney fees and expenses under section 2033.420 for plaintiffs' failure to admit certain requests for admission (RFAs). We affirm the orders.

FACTS

*1. Timeline of Events*

The accident occurred in the dark, early morning hours just after Halloween 2007. The freight train was about 5,600 feet long (about a mile) and consisted of three locomotives and 86 cars. Defendant Holmes, the conductor, and Carl Zippperman, the engineer, operated the train and sat next to each other in the front of the first locomotive cab.

Holmes and Zipperman were familiar with the area of the accident, having passed through it over a hundred times. Both were alert, attentive, and monitoring the track for obstructions. Despite the darkness, the weather was clear and the train's headlights were on bright. At the time of the accident, the train was on a straight track and they could see 2,700 feet in front of them. About a quarter of a mile before the collision, Holmes looked down for five to seven seconds to write federally-required information about signals and train speed in his conductor's log book. Upon finishing, he looked up and continued scanning the area in front of the train but did not see anything

3

for several seconds. They had just passed a Metrolink station and had received a green signal, or "all clear," meaning they were allowed to proceed at maximum speed.

The train was heading north on track 1, the westernmost track of three tracks. As it approached the grade or level crossing at Mission Inn Avenue, the driver of the SUV was traveling east on Mission Inn Avenue and turned right onto the railroad tracks. She proceeded over track 1 toward track 3, drove south for about a hundred feet between two tracks, then veered right, back over track 1, down a gully, and into a block wall. The SUV came to rest at an angle facing the oncoming train, with its right front corner against the wall, and its rear extended backwards such that its left rear wheel was sitting on the track. Both decedents, aged 23 and 18, were over the legal limit for alcohol consumption (.15 and .03 percent, respectively).

The train was equipped with an Event Data Recorder (EDR) or black box, which records at one second intervals information such as speed, distance, horn status, and braking levels. A video camera called a Track Image Recorder (TIR) is mounted inside the dash of the locomotive. It captures events occurring in the front of the locomotive in black and white and at low resolution with a fixed focus point of 150 feet out and five feet above the tracks.

David King, plaintiffs' accident reconstruction expert, reviewed the TIR video between 20 to 30 times, forward and backward, frame-by-frame, and with the assistance of another person. He also analyzed the information from the EDR. Colon Fulk, plaintiffs' train operation expert, similarly reviewed the TIR video about 20 to 30 times, "[p]robably more than that" by the time he testified at trial, and the EDR information. According to them, the EDR and TIR show approximately:

- At 56 seconds and 2,700 feet before impact, the SUV's headlights were bouncing or flashing as it went over the tracks. King acknowledged the SUV was on track 3 at that point, whereas the train was traveling on track 1.

- At 48 seconds and 2,300 feet before impact, the SUV struck the block wall.

- At 33 seconds and 1,689 feet before impact, the SUV's dome lights turned on, indicating someone had opened the door.

- At 25 seconds and 1,300 feet before impact, the SUV hazard lights began flashing or blinking.

- At 17 seconds and 912 feet before impact, the first horn blasted.

- At 10 seconds and 520 feet before impact, the driver opened her door. Five seconds later, she walked around the back of the SUV to the passenger side, where she and the passenger hid from the oncoming train.

- At 8 seconds and 450 feet before impact, the second horn sounded.

- At 5 seconds before impact, Zipperman pushed the lever for the automatic or air brake (also called the service brake), which also controls the emergency brake.

- At 1 second before impact, the emergency brake was engaged. The train traveled 1,162 feet after that and another 1,116 feet following impact.

Meanwhile as the train approached the crossing during that same minute, Holmes saw something reflecting red but could not determine its origin. He asked Zimmerman, who responded he saw something red but did not know what it was. They continued to try to ascertain whether it was an obstacle or a threat to life or property. Neither saw any flashing or bouncing lights, or headlights, before the collision.

Zipperman routinely sounds his horn at a railroad crossing twice, one short and one long. He blew the first horn about 17 seconds before impact, when the train was around 900 feet away from the crossing, and the second one shortly after that. Zipperman did not sound his first horn for the vehicle, as he had not seen it yet, although it may have been when he started to see the red light. Nevertheless, he pushed the automatic brake lever into the service position to reduce the speed and "start the process of stopping the train." The accident occurred during the second horn. Zipperman was sounding the second horn for the crossing when both he and Holmes recognized it was a

5

vehicle that was in front of them.  This was the earliest they could "determine whether that was indeed an obstacle or a threat to life or property as [they] were traveling down the rails."

Holmes yelled out he saw a person.  Zipperman did not see the person because 5 seconds before the collision he had crouched down after having immediately pushed the automatic brake lever forward into the emergency position upon seeing the vehicle.  He had crouched because he was concerned both about derailment and "debris possibly coming through the windshield."  The train was traveling 36 mph at the time.

Holmes and Zipperman testified they did the best they could under the circumstances and considering the time it took to process and react to what they saw. When Holmes reviewed the TIR video for the first time, he was unable to see the SUV any sooner than he had at the time of the accident.  According to plaintiffs' human factors expert witness Dr. Thomas Ayres, Holmes and Zipperman would have had an "emergency perception-reaction time . . . [of] around one to one and a half seconds."


2.  *The Automatic Brake Lever*

An automatic brake lever controls both the air brake (or service brake) and the emergency brake.  To transition to the emergency brake, the automatic brake handle would be moved from the "'service brake' [position] into the far forward position of emergency brake."

King testified that once the automatic brake lever is moved into the emergency brake position, there is "about a five-second lag" before the signal reaches the brakes and the train begins to decelerate.  "[T]he effect of the auto brake pressure dropping to the emergency level" would not have had any effect on the train in this case "until one second before impact."  The train would have taken "'approximately 1,374 feet to come to a stop from the start of the drop of auto brake pressure.'"

6

Defendants' railroad operations expert Brian Heikkila provided slightly different numbers, namely that given the number of locomotives and rail cars in this instance, the air brake on the train would not have "achieve[d] maximum braking force" until 10 to 12 seconds after the emergency brake was activated. Under the circumstances, initiating the emergency brake instead of the service brake would have made a difference of "under 200th of a second."

*3. Standards for Emergency Braking*

Holmes and Zipperman knew they had to employ the emergency brake whenever life or property is in danger, meaning when such danger is imminent, i.e., that it was going to happen. Application of the emergency brake is the fastest way to stop a train. The emergency braking rules states, "A crew member must initiate an emergency brake application without hesitation when life or property is in danger."

Holmes testified the train crew was required to pull the emergency brake only if they "had a high degree of confidence" there was an imminent danger to life or property or where "it [was] evident . . . an obstruction is there." One reason for this is to not delay the train. Another is the risk of derailment, which could have occurred in this instance because although the front part of the train was on "a straight piece of track" about "half a mile or less" long, the rest of it was "on a curve and hanging over the . . . 91 freeway" "in a residential area." Derailment in this situation could have been "extremely serious."

Union Pacific's Manager of Operating Practices Jeffrey Best similarly testified emergency braking "pose[s] the risk of having the train derail, putting equipment on the ground, especially at that location as they were passing over the 91 freeway. They have the potential of maybe putting cars on the ground, going over the freeway, and maybe cause more harm or damage." Although absolute certainty is not required before engaging the emergency brake, the train crew must have "some certainty" a threat to life

7

or property exists. A mere suspicion of an obstruction on the track is not enough. Whether to use the emergency brake or to slow the train down are decisions left to the discretion of the train crew based on what they are able to see. Best watched the TIR video twice. Both times, he "saw [the train crew] place the train in emergency at the same time that I saw the lights flashing." He could not say if he would have seen the SUV earlier in real life. He believed the train crew properly followed all procedures and protocols under the circumstances to protect life and property.

Heikkila provided his expert opinion that the mere possibility of an obstruction on the track does not require the train crew "to immediately go into emergency" but only "when, in the professional judgment of the crew, there is an imminent danger of collision or of an obstruction on the track." Going into emergency based on a mere possibility of an obstruction would be irresponsible. Emergency braking may cause derailment, equipment problems, "block[e]d crossings and other issues that can affect the operation and safety of the community."

### 4. *Expert Opinions Regarding Compliance with the Standard of Care*

Fulk opined that Holmes acted below the standard of care in completing his conductor's log while entering the area of the accident. Fulk also believed the train crew was not being alert and attentive, reasoning that they should have seen the bouncing headlights given the clear weather and their knowledge of what to look for.

Heikkila provided the opposite opinion. Part of his investigation included recreating the scene of the accident with a locomotive and an exemplar taillight from the same make and model of decedents' SUV. He observed the taillight at night from inside the locomotive from different distances. The taillight became "incrementally less conspicuous or less visible as the locomotive was moved further" away. When he reached a distance of 1,250 feet, the taillight was discernible but "very innocuous or very inconspicuous" and "unremarkable" as a visual cue. That "level of visibility" was

8

"certainly not" something that would cause him or any other reasonable engineer to stop a train. Entering the crossing, "there is a tremendous amount of variable lighting" from "[t]he Metrolink complex itself, . . . the side structures and installations and lights that can be seen in the TIR video."

Additionally, the track signals heading into the area where the accident occurred indicated to the train crew that all was clear and they could proceed. The train was traveling under the speed limit of 40 miles per hour and the crew had no advance warning of any problem ahead. Another indicator the track was clear was that a train had passed the area of the accident in the opposite direction on an adjacent tract just as Union Pacific's train was entering the same area. If there had been an obstruction, the passing train would have notified them.

According to Heikkila, "initial service braking occurred" about 258 feet or 5 seconds before impact, the emergency braking took place approximately a second or 46 feet before impact, and the train stopped approximately 1,116 feet after impact.

Without "factoring in perception/reaction time," Heikkila opined the emergency brake would have had to have been initiated at least 1,162 feet from the vehicle in order for the train to have arrived at a complete stop before impact. But there was nothing visible at that point for the train crew to engage full emergency braking. The red light observed by the train crew less than a quarter mile away was not enough, as it was merely an unusual, innocuous red light that was not visible as belonging to a vehicle until the closing moments before impact. Fulk agreed, during cross-examination, that the emergency brake did not have to be applied when the train crew initially saw the red light, but only when they determined it to be an obstruction on their track.

Although a detailed analysis of the TIR video viewed in hindsight could disclose the specifics of what was unfolding in front of the train, they were not discernible to the train crew as the events were happening. A normal, reasonable engineer or conductor would not have recognized all the visual cues visible in the video

9

as being an imminent threat to life or property. Upon viewing the TIR for the first time, Heikkila himself "wasn't able to piece all of these various elements together even knowing that ultimately the SUV was at a location of approximately 104 feet south of the crossing."

After watching the TIR video about 40 times, Heikkila did not believe the train crew should have attempted to stop the train any sooner than they did. He could not see the SUV in the video until after the train had passed a point that was 641 feet away from impact, which was a little over half the distance required to avoid the collision. The train crew recognized a vehicle was on the track and employed the emergency brake when he expected them to. Heikkila opined the train crew was alert and attentive as they approached the crossing, acted within the standard of care, operated the train in a proper manner, and did not cause or contribute to the accident.

DISCUSSION

1. *Plaintiffs' Appeal*

Plaintiffs contend the trial court abused its discretion in denying their motion for new trial because the verdict was "against the weight of the evidence." (Italics omitted.) But that is not the question before us.

That was the question before the trial court on the new trial motion. We have no power to "weigh the evidence." We are allowed here only to determine whether there was substantial evidence – contradicted or uncontradicted – to support the trial court's determination. We conclude there was.

An order denying a motion for new trial "may be reviewed on appeal from the underlying judgment." (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18.) "When a trial court rules upon a motion for a new trial made upon the ground of insufficiency of the evidence, the judge is required to

10

weigh the evidence and judge the credibility of witnesses. In so doing, the court may disbelieve witnesses and draw inferences contrary to those supporting the verdict. [Citation.] Nonetheless, a new trial cannot be granted '. . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, *that the court or jury clearly should have reached a different verdict or decision*.' [Citation.] And denial of such motion will not be disturbed on appeal unless it is manifest that said ruling was an abuse of discretion. [Citation.] [¶] . . . [¶] In reviewing the trial court's exercise of its discretion, this court, unlike the trial court, does not weigh the evidence; our power begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the jury's verdict." (*Locksley v. Ungureanu* (1986) 178 Cal.App.3d 457, 463.)

Plaintiffs argue that defendants admitted and confirmed during closing argument that decedents' vehicle became visible as an obstruction at 641 feet and approximately 12 seconds from impact but did not apply the emergency brake until 1 second from impact. But in actuality, Heikkila testified that upon reviewing the TIR video, "the SUV isn't visible until the train proceeds past . . . a point . . . 641 feet south of the point of impact." As defendants note, Heikkila did not specify "where along that continuum the vehicle became visible to him in the TIR video."

Further, Heikkila testified he arrived at this conclusion only *after having reviewed the TIR video about 40 times*, not that the SUV became fully visible to the train crew at some point 641 feet from the collision at the time it was happening. As Heikkila explained, "the analysis of this case is centered potentially on one minute in real time that occurred on the date of the incident as one flu[id] event that was witnessed by the train crew on one occasion as it occurred. And subsequent to that, due to the resources we have with the TIR and event record data, but primarily the TIR, we are able to repetitively review and review this particular one minute in time, and based on the understanding of how the accident scenario unfolded through reconstruction put together

11

a timeline of when certain events occurred, events which [seen] for the first and only time by the train crew would not be discernable or determinable by them at that point."

Plaintiffs' experts King and Fulk themselves had viewed the TIR video between 20 to 30 times, if not more, before arriving at their conclusions. King agreed, "you really just can't look at it once. You have to look at this video, and look at it, and look at it again, pause it, and go back and go forward and count the frames and get a specific feel for where everything is happening." "Every time you watch it, you appreciate it more and more and more." The trial court could have concluded such testimony supported the jury's verdict, notwithstanding King's other stated reasons for having to view the TIR video numerous times.

Plaintiffs contend the train crew breached their duties to be continuously alert and on the lookout for obstructions and to apply the emergency brake without hesitation when the SUV became visible as an obstruction. They argue that despite the visual cues at different times indicating the "clearly visible" presence and unobstructed view of a vehicle on the TIR video, which could be seen better in person, the train crew waited until the last second to apply the emergency brake. Plaintiffs then go through the timeline as shown by the TIR.

We reject the argument for the same reason as above. The contentions are nothing more than a request that we reweigh the evidence that the trial court and jury have already weighed in favor of defendants. Opposing experts Heikkila and Fulk agreed the train crew did not have an obligation to pull the emergency brake upon initially seeing the red light and had no obligation to do so until the crew determined there was an obstruction on the track. According to Heikkila, as well as Holmes and Zipperman, the red light was not recognizable as part of a vehicle until shortly before impact, at which point Zipperman immediately employed the emergency brake. None of plaintiffs' claims shows the trial court erred in finding that "'the evidence . . . was sufficient to sustain the verdict.'" (*Barrese v. Murray* (2011) 198 Cal.App.4th 494, 503.)

12

Nor does plaintiffs' argument that defendants admitted they sounded the horn in part to warn the car. Zipperman testified he did not sound his first horn to warn the vehicle, as he had not seen it, and that he sounded the second horn for the crossing, which is the point when he and Holmes realized the object in front of them was a vehicle.

The same applies to plaintiffs' claims the train crew was not paying attention because (1) Holmes looked down for 5 to 7 seconds to write required information in his conductor's log, which Fulk testified was not within the standard of care as he could have chosen a safer time, and (2) Zipperman admitted that he probably did not sleep the night before his shift. Heikkila disagreed with Fulk's opinions and concluded the evidence showed the train crew acted within the standard of care and were alert and attentive as they approached the crossing. Both the jury and the court were free to choose which testimony was more convincing.

The trial court did not abuse its discretion in denying plaintiffs' new trial motion. And because substantial evidence supports the jury's verdict for the same reasons, we affirm the judgment in defendants' favor. (*Locksley v. Ungureanu, supra*, 178 Cal.App.3d 457, 463.)

## 2. *Union Pacific's Cross-Appeal*

After trial, Union Pacific moved to recover its expert witness fees under section 998 on the ground the defense verdict was a more favorable result than the statutory settlement offers it had made to plaintiffs. It also sought to recover its attorney fees and expenses from plaintiffs under section 2033.420, as a sanction for plaintiffs' bad faith denial of its requests for admissions. The trial court granted plaintiffs' motion to tax the requested witness fees and denied Union Pacific's motion for attorney fees and expenses. Union Pacific (defendant Holmes is not a party to the cross-appeal) cross-appeals from these rulings. We affirm.

13

*2.1  Motion to Tax Expert Witness Fees*

*2.1.1  Background*

Union Pacific argues the court abused its discretion in granting plaintiffs'
motion to tax defendants' expert witness fees.  We are not persuaded.

Plaintiffs filed their original complaint in October 2008 and a first amended
complaint five months later, which Union Pacific answered in April 2009.  Two months
later, Union Pacific served section 998 offers to plaintiffs consisting of $25,000 for each
family.  The offers expired by operation of law in July 2009.  The trial took place nearly
four years later in March 2013.

After trial, defendants filed a memorandum of costs that included a request
for almost $123,000 in expert witness fees.  Plaintiffs moved to tax the expert witness
fees, arguing that although they had the TIR video before they filed their complaint, they
believed it showed defendants' liability because they had pushed the emergency brake 1
second before the collision.  Additionally, when the section 998 offers expired, plaintiffs
had "deposed one third party witness, and were still in the process of reviewing
previously served written discovery responses."   All of defendants' expert witness fees
were incurred after the section 998 offers expired.  Plaintiffs also did not know which
decedent was driving the SUV when it stopped on the train tracks, and for the parents "to
take a $25,000 offer when we knew one girl was probably more at fault than the other,
and we still don't know which one it is, and for them to get $0 would be unreasonable."
The court granted the motion.

*2.1.2  No Abuse of Discretion*

Under section 998, subdivision (c)(1), if a plaintiff does not accept a
defendant's settlement offer and the plaintiff fails to obtain a more favorable judgment or

14

award, the plaintiff must pay the defendant's postoffer costs.  In addition, the court, in its discretion, may require the plaintiff to pay a reasonable sum to cover expert witness fees.  (*Ibid*.)  "[T]he decision to award expert witness fees, and the determination of whether these fees were reasonably necessary, are issues left to the discretion of the trial court."  (*Adams v. Ford* (2011) 199 Cal.App.4th 1475, 1484 (*Adams*).)  The trial court, having heard the entire case and observed the expert witnesses' testimony, is in a better position than an appellate court to exercise this discretion and determine what fees were reasonably necessary.  (*Id*. at pp. 1484, 1488.)  Thus, an appellate court ordinarily should reverse the trial court's determination only if it finds "in light of all the evidence viewed most favorably in support of the trial court, no judge could have reasonably reached a similar result."  (*Id*. at p. 1484.)

Union Pacific contends the court applied the wrong standard in determining the reasonableness of its section 998 offers based on plaintiffs' claims they did not know, at the time the offers were made, which decedent was driving and whether she was at fault.  But that was only part of the court's analysis.  The court ruled that despite 20/20 hindsight, it was "not convinced" the offers were reasonable given "that stage of the litigation [when they were made] . . . *and* the argument [plaintiffs' counsel] just made with regard to one or the other of the decedents not being at fault."  (Italics added.)  Union Pacific's view of the court's ruling fails to take into account the word "and."

But Union Pacific is correct its section 998 offers are presumed to have been reasonable because it prevailed and plaintiffs had the burden of showing otherwise.  (*Santantonio v. Westinghouse Broadcasting Co*. (1994) 25 Cal.App.4th 102, 117 (*Santantonio*).)  Here, the jury found defendant was not liable, establishing the prima facie reasonableness of its offers and shifting the burden to plaintiffs to show otherwise.

The trial court determined plaintiffs met that burden.  On appeal, Union Pacific needed to show the trial court abused its discretion in reaching that decision.  (*Thompson v. Miller* (2003) 112 Cal.App.4th 327, 339.)  It has not done so.

15

The reasonableness of a defendant's section 998 offer is evaluated in light of "what the offeree knows or does not know at the time the offer is made." (*Santantonio, supra*, 25 Cal.App.4th at p. 119.)  The trial court first must determine "whether the offer represents a reasonable prediction of the amount of money, if any, defendant would have to pay plaintiff following a trial, discounted by an appropriate factor for receipt of money by plaintiff before trial, all premised upon information that was known or reasonably should have been known *to the defendant*." (*Elrod v. Oregon Cummins Diesel, Inc*. (1987) 195 Cal.App.3d 692, 699, fn. omitted.  (*Elrod*).)  If the offer passes that test, the court then must assess "whether defendant's information was known or reasonably should have been known to plaintiff." (*Ibid*.)

Union Pacific states that when it made the section 998 offers, "it was patently obvious" it had no liability.  "All of the evidence supported [its] position that it was not liable" because decedents drove onto the railroad tracks and crashed into a wall, hid behind the SUV instead of running away, were not legally entitled to drive because they had been drinking, plus the TIR video, which plaintiffs had possessed "**for nearly a year,**" showed "there was no way the train crew could or should have recognized that there was an obstruction on the tracks any sooner than it did, and that it reacted appropriately once that obstruction became apparent."

Most of Union Pacific's arguments go toward decedents' comparative negligence, not defendants' lack of liability.  Also, the extent of what the TIR video depicts and the standard of care required of defendants were open to different views, as shown by the varying opinions of the experts.  Union Pacific itself acknowledges "it was *difficult* to see" the SUV or its lights in the TIR video.  (Italics added.)  Whether the train crew was expected to see them despite that difficulty remained to be seen following discovery, which was in its initial stages.

In *Najera v. Huerta* (2011) 191 Cal.App.4th 872, the plaintiff served a section 998 offer along with the complaint.  Although the plaintiff prevailed at trial, the

16

trial court denied his request for expert fees because he had served the offer without giving the defendant a reasonable opportunity to conduct discovery. (*Id*. at pp. 878-879.) The Court of Appeal affirmed, noting that "'litigants should be given a chance to learn the facts that underlie the dispute and consider how the law applies before they are asked to make a decision that, if made incorrectly, could add significantly to their costs of trial.'" (*Id*. at p. 878.)

Here, defendants served their section 998 offer two months after they answered plaintiffs' amended complaint. When the offers expired in July, plaintiffs had deposed one third party witness and were reviewing written discovery responses. No expert had begun any work on the case.

Union Pacific asserts expert testimony was not necessary because plaintiffs admitted that the only evidence they "needed to evaluate the offer was the TIR video." But such statement was made by plaintiffs in an attempt to distinguish the *Adams* case, not a concession they had no need for any expert analysis of the video, the facts of the case, or the standard of care for an engineer or conductor under the circumstances.

Union Pacific analogizes this case to *Adams*, *supra*, 199 Cal.App.4th 1475, which affirmed the trial court's denial of the plaintiffs' motion to tax the defendant's expert witness fees. (*Id*. at p. 1478.) But there, the section 998 offer was made "*four years into the litigation*" and "*[a] few days before trial*" (*id.* at pp. 1478, 1479, italics added). And in *Sanantonio, supra*, 25 Cal.App.4th 102, the section 998 offer was made *five months before the directed verdict* for the defendant "[*f]ollowing a lengthy jury trial*." (*Id.* at pp. 108-109, italics added.) Here, the section 998 offer was served a mere two months after defendants answered the first amended complaint. And despite the case being "*nearly a year old*" (italics added) as Union Pacific claims, it was in the early stages of discovery, making it quite different rather than "nearly identical."

United Pacific has not demonstrated that the court abused its discretion in denying fees under these circumstances. (See *Najera v. Huerta, supra*, 191 Cal.App.4th

17

at p. 877.) Having presided over the six-week trial involving a complex battle of experts, the trial court was "in the best position to evaluate the reasonableness of [Union Pacific's] section 998 offer." (*Adams, supra*, 199 Cal.App.4th at p. 1486.)

### 2.2 Attorney Fees and Expenses Under Section 2033.420

#### 2.2.1 Background

Union Pacific contends the court erred in denying its motion for attorney fees and expenses under section 2033.420. We disagree.

Union Pacific served plaintiffs with RFAs that decedents could not legally operate a vehicle due to their blood alcohol contents (blood alcohol RFAs) and that each decedents' negligence was the proximate cause, and a cause, of the accident (causation RFAs). Plaintiffs objected to and denied the requests.

Following the jury's verdict in its favor, Union Pacific moved for attorney fees and expenses based on plaintiffs' failure to reasonably admit the referenced RFAs. The trial court denied the motion. It found plaintiffs had unreasonably failed to admit the blood alcohol RFAs but had reasonably denied the causation RFAs. The court reasoned "that nobody is sure whose conduct caused what. We don't know who was driving, we don't know who did what at the scene. So I can't say it was unreasonable to deny those requests for admission." The court also refused to award a portion of the requested fees and expenses based on Union Pacific's failure to establish the exact time and expense it incurred as a result of the improperly denied RFAs.

#### 2.2.2 No Abuse of Discretion

Section 2033.420, subdivision (a) provides: "If a party fails to admit . . . the truth of any matter when requested to do so under this chapter, and if the party requesting that admission thereafter proves . . . the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom

18

the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees."  The court must make such an order unless certain exceptions exist.  (§ 2033.420, subd. (b).)

"The primary purpose of requests for admissions is to set at rest triable issues so that they will not have to be tried; they are aimed at expediting trial.  [Citation.]  The basis for imposing sanctions . . . is directly related to that purpose.  Unlike other discovery sanctions, an award of expenses . . . is not a penalty.  Instead, it is designed to reimburse reasonable expenses incurred by a party in proving the truth of a requested admission where the admission sought was 'of substantial importance' [citations] such that trial would have been expedited or shortened if the request had been admitted."  (*Brooks v. American Broadcasting Co*. (1986) 179 Cal.App.3d 500, 509 (*Brooks*) [discussing predecessor to section 2033.420].)

The trial court's ruling on a section 2033.420 motion is reviewed for an abuse of discretion.  (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729 (*Bloxham*).)  Union Pacific acknowledges this standard but claims we should review the order de novo.  It cites *Connerly v. State Personnel Bd*. (2006) 37 Cal.4th 1169, which held that although an attorney fee award after trial is normally abuse of discretion, "de novo review . . . is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law."  (*Id*. at p. 1175.)  But there, "the question [was] whether [an entity acting as amicus curiae] can be assessed attorney fees under section 1021.5 as an 'opposing part[y]' within the meaning of that statute.  Under some circumstances, this may be a mixed question of law and fact and, if factual questions predominate, may warrant a deferential standard of review.  [Citation.]  As will become clear below, however, the material facts in the present case are largely undisputed.  The controversy is over whether a litigant in the [entity's] somewhat unusual position can be considered an

19

'opposing party.' This is a question of law and is reviewed by us de novo." (*Id*. at pp. 1175-1176.)

The issue here, in contrast, does not involve statutory interpretation. Rather, the question is whether plaintiffs had good reason for their failure to admit the requests for admissions regarding causation and amount of expenses to be awarded, if any. These determinations "'are all within the sound discretion of the trial court.'" (*Bloxham, supra*, 228 Cal.App.4th at p. 753.) "On appeal, the trial court's decision will not be reversed unless the appellant demonstrates that the lower court abused its discretion." (*Brooks, supra*, 179 Cal.App.3d at p. 508.)

Union Pacific contends not knowing "who was driving, or who did what at the scene, is not a good reason for plaintiffs to deny the requests for admission" because "ample evidence" showed both decedents could not legally drive given their intoxication. According to Union Pacific, plaintiffs knew when they denied the requests that "at least one of them was a cause or proximate cause of the accident" and thus they should have "claim[ed a] lack of sufficient information to admit or deny."

But Union Pacific fails to explain how that would have made a difference. Either way, plaintiffs did not admit that either decedent was the proximate cause or a cause of the accident. Additionally, the RFAs asked plaintiffs to admit *each* decedent individually proximately caused or was a cause of the accident. Union Pacific does not address how the passenger would be the proximate cause or a cause of the accident. Without knowing which decedent did what and the underlying circumstances, we are not persuaded the court abused its discretion.

Union Pacific maintains the wording of its RFAs is not one of the factors identified by *Brooks, supra*, 179 Cal.App.3d at pages 510-512, for determining whether good cause existed to deny a request. But *Brooks* specifically stated that it was not "attempt[ing] to absolutely define and limit the factors which may properly be considered

20

by a trial court in applying the requirements of section [2033.420]" (*id*. at p. 511) but had merely "set forth general rules and guidelines which should be considered." (*Ibid*.)

The trial court did not abuse its discretion in denying attorney fees to Union Pacific for a separate reason:  The plain language of section 2033.420 requires that in order to be entitled to recover expenses under that statute, the party who propounded the RFA must "prove the truth" of the matter at issue.  (§ 2033.420, subd. (b).)  Although the court did not address this issue, we review its ruling not its rationale and an order correct under the appropriate legal standard will not be reversed as long as it can be supported on any legal theory.  (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 980-981.)

"'Proof' is the establishment by evidence of a requisite degree of belief concerning a fact in the mind of the trier of fact or the court."  (Evid. Code, § 190.)  "Proof is something more than just evidence.  It is the establishment of a fact in the mind of a judge or jury by way of evidence.  [Citation.]  Until a trier of fact is exposed to evidence *and concludes that the evidence supports a position*, it cannot be said that anything has been proved."  (*Stull v. Sparrow* (2001) 92 Cal.App.4th 860, 865-866, italics added; see *Grace v. Mansourian* (2015) 240 Cal.App.4th 523, 529 ["Costs of proof are recoverable only where the moving party actually proves the matters that are the subject of the requests"].)

We reject Union Pacific's assertion that, "[h]aving heard all of the evidence, the jury found that Union Pacific did not cause the incident or, put another way, that [p]laintiffs did so."  The jury was instructed that negligence means "the failure to use reasonable care to prevent harm to oneself or to others," i.e., that there was a breach of a duty.  The jury answered "No" to the question of whether Union Pacific was negligent and thus was not required to and did not reach the questions of causation by either defendants or decedents.  Union Pacific thus did not "prove[] the . . . truth of [the] matter[s]" of the causation RFAs to the trier of fact.  (§ 2033.420, subd. (a).)

21

Union Pacific claims it proved the issues raised by the RFAs because plaintiffs' counsel admitted during closing arguments that decedents' actions were a substantial factor in causing their deaths. But counsel's arguments do not equate to a conclusion reached by the jury. The same applies to plaintiffs' purported failures to "put up any evidence to support their denials of the [RFAs] at trial [or] challenge Union Pacific's evidence on the issues."

Under these circumstances, the court could have denied Union Pacific's motion based solely on section 2033.420, subdivision (a), for failure to prove the truth of the matter in the causation RFAs. But a further reason exists to uphold the trial court's denial of award of fees and expenses under section 2033.420: Union Pacific failed to provide an accounting of the time and money it had spent *in proving any of the RFAs*, much less the ones the court found plaintiffs had improperly denied.

In *In re Tobacco Cases II* (2015) 240 Cal.App.4th 779, the trial court similarly denied expenses under section 2033.420, because the plaintiffs had "'failed to provide any specific accounting of costs or fees incurred' as a result of Philip Morris's failure to make admissions. Instead, plaintiffs requested 'sanctions equal to the amount of costs that it contends [Philip Morris] may be entitled to.' The court cited *Garcia v. Hyster Co*. (1994) 28 Cal.App.4th 724, 737 . . ., which reversed a sanctions award for the failure to make admissions when counsel 'failed to set out either his hourly fee or any accounting of time spent on the case.' The court also noted plaintiffs 'will have a difficult time parsing out what evidence presented at trial could only be attributed to the [requests for admissions] at issue in this motion since the subject issues are inextricably intertwined with other significant issues in the case.'" (*Id*. at pp. 807-808.)

The appellate court agreed: "Plaintiffs ignore their failure to provide an accounting. They make no effort to show any compliance with . . . section 2033.420[, subdivision (a)'s requirement to establish 'the reasonable expenses incurred in making that proof.'] Thus, they have waived appellate review of the matter. 'In civil appeals, the

22

appellate courts are not required to perform an unassisted study of the record or a review of the law relevant to a party's contentions on appeal. [Citations.] Instead, a party's failure to perform its duty to provide argument, citations to the record, and legal authority in support of a contention may be treated as a waiver of the issue.'" (*In re Tobacco Cases II, supra*, 240 Cal.App.4th at p. 808.)

The same analysis applies here. In its section 2033.420 motion, Union Pacific sought nearly $333,000 in attorney fees and nearly $123,000 in expert witness fees. It supported its motion with defense counsel's declaration detailing the attorney fees and costs incurred from the date plaintiffs denied the RFAs to the date the verdict was rendered. The declaration provided a "month by month breakdown of the fees and activity on which the fees w[ere] based" without any delineation regarding "the reasonable expenses incurred" (§ 2033.420, subd. (a)) to prove the RFA's.

As in *In re Tobacco Cases II*, Union Pacific ignored its obligation under section 2033.420, subdivision (a) to provide an accounting of "the reasonable expenses incurred in" proving the subject RFAs. Union Pacific has cited no authority for their suggestion the trial court had a duty to go through counsel's declaration to parcel out which attorney fees and expenses related to the RFAs, particularly since nothing in the declaration identifies such. And while it is true a trial court is not required to allocate attorney fees for work on issues or claims that are so intertwined that it is impossible to separate them (*Akins v. Enterprise Rent-A-Car Co*. (2000) 79 Cal.App.4th 1127, 1133), Union Pacific has not shown that this is such a case. The matter is waived.


DISPOSITION


The judgment is affirmed. The orders granting plaintiffs' motion to tax the expert witness fees sought by Union Pacific and denying Union Pacific's motion for

23

attorney fees and expenses are affirmed.  Plaintiffs' request for judicial notice is denied. The parties shall bear their own costs on appeal.


RYLAARSDAM, ACTING P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.

24